Carl H. KACZANOWSKI, D.P.M. and Michael J. Guerra, D.P.M., individually and on Behalf of their patients

v.

MEDICAL CENTER HOSPITAL OF VERMONT, Fanny Allen Hospital, Hotel Dieu.

Civ. A. No. 81–336.

United States District Court, D. Vermont.

June 19, 1985.

Robert A. Mello, South Burlington, Vt., for plaintiffs.

Spencer R. Knapp, Dinse, Erdmann & Clapp, Burlington, Vt., for Medical Center Hosp. of Vermont.

Richard Wadhams, Pierson, Affolter & Wadhams, Burlington, Vt., for Fanny Allen Hosp., Hotel Dieu.

## MEMORANDUM OF DECISION

HOLDEN, Senior District Judge.

The plaintiffs Carl H. Kaczanowski, D.P.M., and Michael J. Guerra, D.P.M., seek injunctive and compensatory relief arising from denial of staff privileges by the defendants Medical Center Hospital of Vermont ("MCHV") and the Fanny Allen Hospital, Hotel Dieu ("FAH.") The action was jointly instituted by the plaintiffs indi-

vidually and on behalf of their patients. The United States Magistrate was designated by the court to hear and submit his recommendation for disposition of pretrial motions pursuant to 28 U.S.C. § 636(b)(1). The designation included the defendants' motions for summary judgment.

The facts which compose this action are thoroughly explored and reported by the magistrate. Briefly stated, the magistrate concluded that except for Counts IV and V, charging violations of 42 U.S.C. §§ 1985 and 1986, the record in its entirety presents affirmative issues for proof that preclude granting the defendants' motions for summary judgment. The defendants' objections to this recommendation bring the case on for this court's review.

## FACTUAL BACKGROUND [1]

Plaintiffs Carl H. Kaczanowski, D.P.M., and Michael J. Guerra, D.P.M., are podiatrists licensed by the State of Vermont to practice their profession pursuant to 26 V.S.A. §§ 321 *et seq.* They practice together as the "Vermont Foot Clinic" in Burlington and the "Central Vermont Foot Clinic" in Berlin. Both plaintiffs have been admitted as members of the Central Vermont Medical Center ("CVMC") medical staff, with privileges to perform limited foot surgery at that facility. CVMC is in Washington County and adjoins Chittenden.

MCHV and FAH are both located in Chittenden County. They are the only hospitals in that area. FAH is a private hospital. MCHV is a non-profit hospital medical treatment facility and serves as the primary teaching hospital for the University of Vermont College of Medicine.

Doctors Kaczanowski and Guerra applied to MCHV and FAH to obtain admitting and podiatric surgical privileges as members of the medical staffs of both defendants. Their applications were denied. Plaintiffs claim MCHV and FAH unlawfully forbid them medical staff privileges.

Dr. Kaczanowski sought staff and admitting authority at MCHV in early September 1977. The chairman of the MCHV department of surgery, John Davis, M.D., recommended only limited approval of the application. Specifically, Dr. Davis recommended "Scientific Consultant" status without surgical or admitting privileges. The MCHV medical staff executive committee approved Dr. Davis' recommendation on November 2, 1978. The full medical staff adopted the recommendation on December 6, 1978. The MCHV Board of Trustees accepted the medical staff's decision on January 18, 1979. MCHV gave its decision to Dr. Kaczanowski on January 22, 1979.

Dr. Guerra initiated his application to MCHV in mid-June 1979. Dr. Davis noted his recommendation on Dr. Guerra's application on June 27, 1979. Dr. Davis recommended the same status granted to Dr. Kaczanowski, Scientific Consultant, without privileges to admit or perform surgery. Dr. Guerra never completed his application by submitting three letters of recommendation as required. MCHV did not take further or final action on his application.

Drs. Kaczanowski and Guerra applied to FAH in June 1979. FAH's chief of surgery, Clarence Bunker, M.D., discussed the applications informally with other members of the medical staff who objected to granting plaintiffs any privileges which would overlap the area of the orthopedic surgeons. Dr. Bunker and the surgeons he consulted agreed that plaintiffs should only be allowed to perform soft tissue foot surgery; surgery requiring the cutting of bone was reserved to the orthopedic surgeons.

After consultations with the FAH administrator and the plaintiffs, Dr. Bunker made a formal recommendation to the Fanny Allen Medical Executive Committee. The recommendation would allow plaintiffs to perform soft tissue foot surgery on an outpatient basis. It would restrict the

---

**1.** The following facts are derived primarily from the Magistrate's Report and Recommenda-

tion.

plaintiffs to consulting with attending physicians on inpatient admissions. The committee adopted Dr. Bunker's recommendation.

The plaintiffs, Dr. Kaczanowski and Dr. Guerra, objected to the restrictions on their privileges at FAH. They met with Dr. Bunker and the Medical Executive Committee on June 20, 1980. Dr. Bunker and the committee agreed to reconsider their initial decision in light of the plaintiffs' privileges at CVMC. The FAH Medical Executive Committee later met with the new chief of surgery, Donald Majercik, M.D., on November 21, 1980. Rather than enlarging the privileges, the committee, on Dr. Majercik's recommendation, restricted the privileges previously granted to plaintiffs at FAH. The privileges, as thus curtailed, were limited in the same fashion as those granted at MCHV. The Fanny Allen Medical Staff and Board of Trustees ratified the committee's decision. FAH notified Drs. Kaczanowski and Guerra on January 6, 1981. Plaintiffs commenced this action on October 29, 1981. Extensive discovery ensued, followed by hearings by the magistrate and the district court on defendants' motions for summary judgment.

## THE CLAIMS

The Doctors Kaczanowski and Guerra allege the actions of MCHV and FAH violated the federal antitrust law and their civil rights as protected by the United States Constitution. It is further alleged that the conduct of the defendants offends the Constitution of Vermont and the Vermont statutory and common law.

In summary, Drs. Kaczanowski and Guerra allege both MCHV and FAH based their decisions to deny the applications to practice podiatry to the extent permitted by state law on agreements and acts designed, as a practical matter, to exclude podiatrists from hospital practice. Count I of the complaint alleges unreasonable and substantial trade restraints which violate Section 1 of the Sherman Act. 15 U.S.C. § 1. Count II charges conspiracy and attempt to monopolize in violation of Section 2 of the Sherman Act. 15 U.S.C. § 2.

Count III relies on 42 U.S.C. § 1983 to charge that MCHV and FAH violated constitutional rights protected by the Due Process Clause by depriving the plaintiffs of the privileges sought in their applications. Count IV alleges MCHV and FAH conspired with others to deprive plaintiffs of equal protection and equal privileges and immunities under the laws of the United States, in violation of 42 U.S.C. § 1985(3) and § 1986. In Counts VI—XIV Drs. Kaczanowski and Guerra assert multiple pendent state claims.

## DISCUSSION

■ At the outset, the court is mindful that summary adjudication of antitrust claims is generally disfavored. The Supreme Court has cautioned that motive and intent usually are involved in antitrust litigation, hence summary procedures should be sparingly applied. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). With these standards in mind, the court turns to the central issues that are presented in the extensive record accumulated since the commencement of the action.

*Exhaustion of Remedies*

■ Both FAH and MCHV challenge the Magistrate's recommendation that the court adjudicate the merits of the complaint rather than defer to the internal procedures in the hospital administrative structures. The defendants join in urging that judicial relief be withheld until both plaintiffs have exhausted the remedies afforded by the hospital staffs. The court finds no merit in these contentions. There is no statutory mandate that the plaintiffs exhaust the hospitals' internal appeals. Nor was there any undertaking expressed or implied between plaintiffs and the hospitals which would impose such a requirement.

Indeed the plaintiffs come to this court seeking both equitable and compensatory relief. There is no suggestion that the

relief sought is available from the hospitals. Absent some statutory or other directive, the court declines to stay its review to await further administrative action that may prove to be burdensome and unproductive. The court approves that aspect of the Magistrate's report that recommends against imposing an exhaustion requirement in the present state of this controversy. That takes us to the jurisdictional base for Sherman Act violations.

### Sherman Act Claims

Plaintiffs plead that the defendants violated Sections 1 and 2 of the Sherman Act. Section 1 makes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ..." illegal. 15 U.S.C. § 1. Section 2 provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ..." acts illegally. 15 U.S.C. § 2.

■ Since the defendants' alleged wrongful activities are local in nature, the court's attention of necessity turns to the question of whether the record establishes that the defendants' antitrust activity exerted an adverse effect on interstate commerce. The report of the Magistrate concluded in the affirmative.

In the present pretrial posture of the case and in the context of the pending motion for summary judgment the court is inclined to agree. That is not to say that the link between the defendants' denial of staff privileges to the plaintiff and the adverse effect on commerce is clear and strong. Rather the linkage is frail and fragile in the light of *Furlong v. Long Island College Hospital*, 710 F.2d 922, 926 (2d Cir. 1983).[2]

The court is called upon to afford the plaintiffs a conspectus of the record that lends the greatest strength to their opposition to summary judgment. From this vantage point the facts are not conclusive on the effect of the defendants' conduct on interstate commerce. Since the jurisdictional issues of fact remain in dispute, the court is inclined to accept and confirm that aspect of the Magistrate's recommendation that summary judgment on the ground of lack of jurisdiction be denied. *Konick v. Champlain Valley Physicians Hospital Medical Center*, 561 F.Supp. 700, 711–12 (N.D.N.Y.1983), *aff'd on other grounds*, 733 F.2d 1007 (2d Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984).

■ Fulfillment of the essentials of the jurisdictional requirement of the Sherman Act does not settle the question of the antitrust violations claimed by the plaintiffs. The plaintiffs contend that the rejections of their applications for staff and admitting privileges by the defendants constitute *per se* restraint of trade violations. The plaintiffs label the defendants' conduct as "group boycott," "tying arrangement," and "bottleneck."

The conclusive presumption that attends the application of the Act is restricted, in the words of Justice Black in *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), to those

> certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

The first line of inquiry is whether the bylaws of the defendant hospitals, as applied by their respective governing agen-

---

**2.** The *Furlong* court upheld the district court's finding that the plaintiff had failed to plead facts that would support subject matter jurisdiction. The plaintiff did not outline facts from which it was inferable that the defendants' activities, infected with the illegality alleged, were likely to have a substantial effect on commerce. The court held that plaintiff's loss of $120,000 income, a substantial portion of which came from out of state insurers, was also insufficient, although a "closer call," to sustain antitrust jurisdiction on a motion to dismiss.

cies, are "naked restraints of trade with no purpose except stifling of competition." *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963).

*Per se* illegality under the Sherman Act has been "carefully limited." *Walker Process Equipment, Inc. v. Ford Machinery and Chemical Corp.*, 382 U.S. 172, 178, 86 S.Ct. 347, 351, 15 L.Ed.2d 247 (1965) (citing *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963)). The fact that violations are alleged against the hospitals which implicate their medical staffs is insufficient by itself to escape *per se* condemnation where the particular kind of restraint is conclusively presumed to be unreasonable. *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 344–48, 102 S.Ct. 2466, 2473–75, 73 L.Ed.2d 48 (1982). Yet most restraints have been analyzed under the "rule of reason." *Id.* at 343, 102 S.Ct. at 2472.

Of course there is no claim of price fixing here. Nonetheless, the plaintiffs have submitted a standard list of claimed *per se* violations in different varieties, generally in the customary non-professional marketplace.

Recently the Court has considered the claim of a "tying arrangement" between a hospital and a firm of anesthesiologist which was charged as a *per se* violation of the Sherman Act. *Jefferson Parish Hospital v. Hyde*, 466 U.S. 2, ——, 104 S.Ct. 1551, 1553, 80 L.Ed.2d 2 (1984). The Court concluded the record provided no evidence that the hospital "forced any such (anesthesiological) services on unwilling patients" and afforded "[no] basis for applying the *per se* rule" to the violation claimed. *Id.* at ——–——, 104 S.Ct. at 1567. The Court's opinion by Justice Stevens goes further to hold that there was insufficient evidence in the record to provide a basis for finding the accused contract had unreasonably restrained competition:

> In sum, all the record establishes is that the choice of anesthesiologists at East Jefferson has been limited to one of the four doctors who are associated with Roux and therefore have staff privileges. Even if Roux did not have an exclusive contract, the range of alternatives open to the patient would be severely limited by the nature of the transaction and the hospital's unquestioned right to exercise some control over the identity and number of doctors to whom it accords staff privileges.

*Id.* at ——–——, 104 S.Ct. at 1568.

By separate opinion concurring in the Court's decision, Justice O'Connor explained the exclusive dealing contract is "properly analyzed ... and survives scrutiny under the Rule of Reason." Concurring Op. at ——, 104 S.Ct. at 1569 and at ——, 104 S.Ct. at 1576.

In the dental profession the court of appeals affirmed the summary adjudication by the trial court that an association of periodontists imposing a "limited practice requirement" on its members escaped *per se* condemnation under the rubric of group boycott in the presence of public service considerations. *Kreuzer v. American Academy of Peridontology*, 735 F.2d 1479, 1492 (D.C.Cir.1984). Here, we have not been referred to any controlling authority governing "bottleneck" violations within the medical profession. Without further search it is sufficient to say that the record at hand fails to provide adequate legal justification for application of the *per se* rules urged by plaintiffs.

The main thrust of the defendants' motion for summary judgment is advanced on the premise of public service or ethical norms referred to in *Maricopa, supra*, 457 U.S. at 348–349, 102 S.Ct. at 2475; *National Society of Professional Engineers v. United States*, 435 U.S. 679, 696, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788, n. 17, 95 S.Ct. 2004, 2013, n. 17, 44 L.Ed.2d 572 (1975). This analysis is strengthened by reference to the bylaws of MCHV and FAH. It is these prescripts

that provide the underpinning for the plaintiffs' antitrust claims.[3]

■ A medical facility such as those targeted in this controversy is not required to indiscriminately admit all licensed practitioners in the field of health care who wish to attend patients and practice surgery there. *Konik v. Champlain Valley Physicians Hospital,* 733 F.2d 1007, 1015 (2d Cir.1984) (Kearse, J.) Indeed the state itself exercises sensitive discernment in the granting and withholding of licensing privileges among the various levels of medical service. The public health law expressed in the various chapters of Title 26 of the Vermont Statutes Annotated, has firmly implanted discrete limitations among the various disciplines providing health care to patients treated in Vermont.

The main question presented in the record at hand is whether the defendants' exclusion of the plaintiffs from practicing podiatry at the hospitals constituted an unreasonable restraint on interstate commerce in the antitrust sense of suppressing competition as proscribed by the Sherman Act. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 695, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978).

Our search of this question begins with the applicable provisions of the MCHV bylaws in effect at the time of Dr. Kaczanowski's initial application in September of 1977.

### *Article IV*—MEMBERSHIP

SECTION 1. *Qualifications.* (a) Each applicant for membership in the Emeritus, Attending, Visiting, Clinical Associate and Adjunct Groups shall be a graduate of a medical school approved by the appropriate accrediting body, or of a dental school approved by the American Dental Association, or shall be a qualified osteopathic physician who has completed satisfactorily not less than one year of training in a medical program approved by the Council on Medical Education of the American Medical Association; provided, however, that in the event of graduation from a medical, osteopathic or dental school outside of the United States and Canada, this requirement may be waived in exceptional cases after review by the Medical Board and by vote of the Medical Staff. He shall be legally licensed to practice medicine, dentistry or osteopathy in the State of Vermont.

(b) Each nominee for appointment as Scientific Consultant shall be a member of the faculty of the University of Vermont College of Medicine, preeminent in his field of scientific endeavor.

(c) No applicant shall be denied Medical Staff membership on the basis of sex, race, creed, color, or national origin.

By-Laws, Rules and Regulations applicable to the Medical Staff, Medical Center Hospital of Vermont, Inc., September 25, 1975.

The Kaczanowski application to MCHV was accompanied by two letters of reference; one from a podiatrist and one from a physician. The privileges requested in the application were "podiatry as described by state law." The chairman of the Department of Surgery recommended the applicant be appointed and recognized as a scientific consultant without admitting privi-

---

**3.** The preamble to the BY–LAWS, RULES AND REGULATIONS applicable to the medical staff of MCHV provides:

Recognizing that the Medical Staff is responsible for the quality of medical care in the hospital and must accept and assume this responsibility subject to the ultimate authority of the hospital governing body and that the best interests of the patients are protected by concerted effort, the physicians and dentists practicing in the Medical Center Hospital of Vermont, Inc., hereby organize themselves in conformity with the By-Laws, Rules and Regulations hereinafter stated.

The "PURPOSE" of the MCHV "organization" is defined in Article II of the BY–LAWS, RULES AND REGULATIONS as:

1. To insure that all patients admitted to the hospital or treated in the outpatient department receive the best possible care ....

The "PURPOSE" of the Fanny Allen Hospital, as defined in Article II of its Medical Staff BYLAWS, RULES AND REGULATIONS is,

1. To insure that all patients admitted to this Hospital or treated in the Outpatient Department receive the best possible medical care available ....

leges. The recommendation was approved by the executive committee of the medical staff, the full medical staff, and the hospital board of trustees. No appeal was taken from this action.

Dr. Guerra applied for appointment to the medical staff on June 14, 1979 requesting privileges in "Podiatry." Although the application instruction required three letters of reference from physicians, Dr. Guerra did not include the prescribed letters. Regarding the application as incomplete, no further action was taken by MCHV.

The bylaws of the medical staff of FAH recognize podiatrists in the category of scientific consultant to the attending physician, without affording admitting privileges. The regulations do not permit a podiatrist to prescribe medication or treatment. The rules at FAH provide: "The scope and extent of the surgical procedure the podiatrist may perform must be specifically defined by the Chief of Surgery and recommended to the Executive Committee and Medical Staff in the same manner as all other surgical privileges." Fanny Allen Hospital, Medical Staff By-Laws, Rules and Regulations, p. 24.

The magistrate concluded that the defendants were not entitled to summary adjudication in the presence of issues of fact concerning a conspiratorial arrangement. The conclusion derived from these factual ingredients: (1) Both hospitals are located in the Burlington area; (2) the two hospitals share in common some staff members; (3) the plaintiffs produced evidence that someone from the FAH "spoke" with someone from MCHV before the privileges initially recommended for plaintiffs at FAH were sharply reduced; (4) FAH granted plaintiffs "the same privileges as MCHV for substantially the same reasons." Magistrate's Report, p. 37.

■ To be sure, the surgical staffs of both hospitals were entrusted with the responsibility of granting staff privileges for their respective hospitals. Although the staff members had certain economic interests in competition with other members of the medical profession, they were not en-gaged in competition with the hospitals where they held staff privileges. And it has been held that no conspiracy can prevail between a hospital and its medical staff. *Weiss v. York Hospital*, 745 F.2d 786, 817 (3rd Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985.) A conspiracy is not established by proof of the mere opportunity to conspire. *North Eastern Telephone Company v. American Telephone and Telegraph*, 651 F.2d 76, 85 (2d Cir.), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). And a conspiracy to violate the antitrust law is not to be inferred from frequent contact between medical professional bodies on general matters of mutual concern. *Kreuzer v. American Academy of Peridontology*, 735 F.2d at 1488; *Weit v. Continental Illinois National Bank and Trust Co.*, 641 F.2d 457, 462 (7th Cir.1981), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982); *Feldman v. Jackson Memorial Hospital*, 571 F.Supp. 1000, 1008 (S.D.Fla.1983), *aff'd*, 752 F.2d 647 (11th Cir. 1985).

■ The record fails to make it clear that the members of the medical staffs were acting in furtherance of their own professional practice against the interests of the profession and the hospitals they served. Common sense dictates that the use of sensitive medical instruments, which may engage highly technical diagnostic equipment and management of skilled members of the nursing and technological staffs should not be entrusted to applicants who fail to meet a high level of advanced medical training. In this sense the denial of admitting and full staff privileges does not constitute an unreasonable restraint of trade in violation of the Sherman Act.

There are other considerations which reside in the bylaws and their application challenged in this controversy. This was well explained by Judge Fuld writing for the New York Court of Appeals.

The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors

and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and internes, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of "hospital facilities" expects that the hospital will attempt to cure him, not that its nurses or other employes will act on their own responsibility.

*Bing v. Thunig,* 2 N.Y.2d 656, 163 N.Y. S.2d 3, 8, 143 N.E.2d 3, 8 (1957).

Since the removal of the cloak of charitable immunity, hospitals across the land have had a serious and well-founded concern that they be subjected to liability for acts and omissions of the hospital staff in ministering to patients admitted to the facility.

The standards for Hospital Accreditation, the state licensing regulations and the defendant's bylaws demonstrate that the medical profession and other responsible authorities regard it as both desirable and feasible that a hospital assume certain responsibilities for the care of the patient.

*Darling v. Charleston Community Memorial Hospital,* 33 Ill.2d 326, 211 N.E.2d 253, 14 A.L.R.3d 860, 867 (Schaefer, J.), *cert. denied,* 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966). *See also Woodard v. Porter Hospital,* 125 Vt. 419, 217 A.2d 37 (1966); *Minogue v. Rutland Hospital,* 119 Vt. 336, 125 A.2d 796 (1956).

It may be said, as the magistrate did, that podiatrists may be disadvantaged for want of full medical staff privileges, equivalent to those enjoyed by physicians and surgeons. By the same token, orthopedic surgeons may experience some corresponding advantage. That disparity does not of itself generate an economic impact affect-

ing interstate commerce within the proscription of the Sherman Act. And as noted earlier, MCHV, as a regional referral medical center and teaching hospital, carries a special responsibility, not only to the patients entrusted to its care, but to the public generally.

■ Beyond that, the complaint and the record which has developed, fail to demonstrate what anti-competitive effect, if any, the exclusion of the plaintiffs from the hospital staffs has in the relevant medical marketplace. In terms of the Rule of Reason, to demonstrate a right to relief the plaintiff must bring forth "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (Marshall, J.).

The record fails to supply the essential ingredients of economic impact. The plaintiffs concede that there are at least two hospitals in the general area that afford limited staff privileges to podiatrists. The fact that plaintiffs have been affected by the exclusion from the defendant hospitals is not enough to justify relief under the Act. *E.g. Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (Warren, C.J.) (Congressional concern with protection of competition, not competitors.)

Under the law as applied to the undisputed facts disclosed by the record, the plaintiffs are not entitled to relief under Section 1 of the Sherman Act. "The offense of monopoly under § 2 of the Sherman Act has two elements: 1) the possession of monopoly power in the relevant market and 2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

The facts do not support a finding that the maintenance of the alleged monopoly was willful. Plaintiffs contend that the

physicians who made the decisions not to grant privileges have a strong economic interest in excluding podiatrists from the hospitals, urging that if podiatrists have surgical privileges they will be able to compete with present staff members on an equal basis. · This contention, if true, may support a finding that the *individual physicians* have an anticompetitive purpose to exclude podiatrists; it does not explain an economic motive on the part of the *hospital* to discriminate against podiatrists. Indeed, the plaintiffs argue that the hospital and medical staff had different motives.

The full medical staff and Board of Trustees of both facilities reviewed the recommendations of the chiefs of surgery. The respective medical staffs and governing boards appropriately may be inclined to economic considerations. It is similarly proper to promote worthy professional standards by close examination of the qualifications of medical professionals who apply. There is no evidence to support a finding that the hospitals, through their medical staffs and boards of review, acted contrary to these interests. Patently, the plaintiffs' credentials do not meet the minimum standards set by the hospitals to promote the highest quality of patient care. The facts, viewed in the light most favorable to the plaintiffs, do not provide evidence that the defendants willfully pursued the alleged monopoly.

To be sure, the medical specialty of podiatry may advance to the point where other segments of the medical profession will be called upon to afford podiatrists broadened surgical and admitting hospital privileges. Such recognition may derive from the medical profession at large or by legislative action. From the record at hand, there is nothing by way of the Sherman Act to call upon the courts to intrude upon a responsibility reserved to medical decision makers.

The court finds no meaningful evidentiary support in the record at hand for the conclusion that the medical staff bylaws as applied by the defendant hospitals excluded the plaintiffs from the practice of podiatry in the appropriate medical market in upstate New York and northern Vermont. *E.g. Feldman v. Jackson Memorial Hospital, supra,* 571 F.Supp. 1000 (exclusion of podiatrist from hospital staff presented no triable antitrust issue). Summary judgment will be entered for the defendants for want of triable issues on the plaintiffs' antitrust claims.

*Civil Rights Claims*  ·

To present triable issues on the plaintiffs' civil rights claims under 42 U.S.C. §§ 1983, 1985, 1986, and the United States Constitution, the alleged violation must be linked to "state action." A defendant's conduct satisfies this requirement when it meets at least one of the four factors recently articulated by the Court in *Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 939, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982): 1) the "public function"; 2) the "state compulsion"; 3) the "nexus"; and 4) the "joint action" tests. *Id.*

In dealing with the civil rights aspect of this controversy, the teaching of *Lugar, supra,* marks the direction of travel.

> [T]he first question is whether the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority. The second question is whether, under the facts of this case, respondents, who are private parties, may be appropriately characterized as "state actors."

457 U.S. at 939, 102 S.Ct. at 2755. *Cf. Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

> Careful adherence to the "state action" requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. It also avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed. A major consequence is to require the courts to respect the limits of their own power as directed against state governments and private interests. Whether this is good or bad policy, it is a fundamental fact of our political order.... Without a limit such as this,

private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them.

457 U.S. at 936–37, 102 S.Ct. at 2753.

The court's attention has not been directed to a particular aspect of Vermont's public health law which delegates authority to the defendants, as private hospitals, to exclude podiatrists from staff privileges at their respective facilities. The plaintiffs do not target the State of Vermont as the source of the deprivation caused here. If the plaintiffs' exclusion can be said to spring from the state, the next inquiry is whether the hospitals charged here can be appropriately characterized as "active participants in state action."

The magistrate reported that both defendants have received Hill-Burton funds from the federal fisc, and enjoy tax exemptions and have licensing privileges from the State of Vermont. In a similar setting these points have been held insufficient to avoid dismissal of the civil rights actions for lack of state action in the denial of staff privileges by a private hospital.

While these facts show some state involvement in the activities of the Hospital, the existence of "state action" depends on "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). As we said in *Powe v. Miles,* 407 F.2d 73, 81 (2d Cir.1968), "the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury."

*Schlein v. Milford Hospital,* 561 F.2d 427, 428 (2d Cir.1977). Of the same substance and effect are *Barrett v. United Hospital,* 376 F.Supp. 791, 803 (S.D.N.Y.), *aff'd mem.,* 506 F.2d 1395 (2d Cir.1974) and *Bev-*

*erley v. Douglas,* 591 F.Supp. 1321, 1329 (S.D.N.Y.1984) (Weinfeld, J.).

■ Plaintiffs urge that state action is satisfied with respect to MCHV on the basis of its "nexus" with the State of Vermont. The connection factor requires the court to determine whether private conduct is so intertwined with the state that the conduct is no longer private. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). This circuit has developed a further analysis to determine whether state action is satisfied: 1) the state's involvement with the private institution must be significant; 2) the state must be involved with the activity that caused the injury; and 3) the state's involvement must somehow aid the complained of activity. *Schlein, supra* at 428; *Barrett, supra* at 797.

MCHV is the teaching hospital for the University of Vermont. Its bylaws provide: "In general the Chief of a department or Service shall be the chairman of the corresponding department or division at the College of Medicine." Medical Staff By-Laws, Article III, Section 3. The court is not persuaded that this interweave of the functions of teaching medicine at the College and providing medical care at the private hospital constitutes state action in the deprivation of which the plaintiffs complain. The record discloses no concert of action or agreement between the College of Medicine and MCHV concerning the disposition of the applications for staff privileges at the Medical Center Hospital. Further, under the bylaws staff privileges decisions are made by MCHV's Board of Trustees, rather than the chiefs of the hospital's clinical services.

Although Dr. Davis held contemporaneous positions as chief of staff for the Department of Surgery and chairman of a department at the College of Medicine, the record does not demonstrate in answer to the defendants' motions for summary adjudication, that the source of his staff privilege recommendations derived from the state or that his conduct, can be deemed participation by a state official. According-

ly, it cannot be held that the state aided or was involved in the complained of activity. The record at hand fails to achieve the essential link between the MCHV staff privileges decision and the State of Vermont to meet the demands of state action within the sense and purpose of the Civil Rights Act. This aspect of the plaintiffs' complaints against MCHV and FAH must be dismissed for lack of state action within the meaning of 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343.

■■■ The remaining claims asserted on the provisions of 42 U.S.C. § 1985(3) and § 1986 are appropriate for disposition by summary adjudication. Although section 1985(3) does not require state action, under this facet of the Civil Rights Act, as Magistrate Niedermeier correctly observed, it is essential to relief that the element of invidiously discriminatory class-based motivation be present. *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). The plaintiffs have raised no objection to the dismissal of the counts based on these provisions of the civil rights statute.

This litigation is not of recent origin. The discovery pursued by the parties has developed a voluminous record, which has been well canvassed.

Summary judgment under Rule 56 is not a total stranger to the plaintiffs' claims. "When a motion for summary judgment is made and supported ... an adverse party ... must set forth specific facts showing there is a genuine issue for trial." Fed.R. Civ.P. 56(e). This means

> that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.

*First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

■■■ The record at hand fails to make that showing. The court is persuaded by its survey of the expansive record already composed in light of all the favorable in-

tendments in support of the plaintiffs' side of this controversy, that the defendants are entitled to summary judgment as a matter of law. The root and stock of both party plaintiffs' claims are the hospital bylaws as written and applied by the governing councils of the defendants charged in this action. They survive the present challenge.

### Pendent Claims

■■■ Dismissal of the predominant federal claims leaves the remaining state causes of action unattended in terms of judicial power.

> [The] power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right .... Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

In keeping with the instruction provided in *Gibbs*, the pendent state claims will be dismissed without prejudice and "left for resolution to state tribunals." *Id.*

### CONCLUSION

The exclusion of the plaintiffs from full staff privileges at the defendant hospitals does not constitute a violation of the Sherman Act. Neither does the record, construed in the aspect lending the greatest strength to the plaintiffs' contentions under the Civil Rights Act, present triable claims for relief. These legal conclusions make it unnecessary to consider the remaining points that have been carefully and comprehensively included in the magistrate's report.

For the reasons stated in this opinion,

1. The clerk will enter summary judgment for the defendants on Counts I and II of the plaintiffs' complaint alleging violation of the Sherman Act.

2.  Counts III through V of the plaintiffs' complaint alleging violations of the Civil Rights Act are dismissed.

3.  The remaining Counts of the complaint are dismissed without prejudice.

4.  Judgment will be entered without costs to either side.

It is SO ORDERED.