Kᴀᴍᴄᴏ Sᴜᴘᴘʟʏ Cᴏʀᴘ., Plaintiff/Third-Party Defendant-Respondent, v Oɴ ᴛʜᴇ Rɪɢʜᴛ Tʀᴀᴄᴋ, LLC, Defendant/Third-Party Plaintiff-Appellant. Sᴏᴜᴛʜᴇᴀsᴛᴇʀɴ Mᴇᴛᴀʟ, Iɴᴄ., Additional Third-Party Plaintiff-Appellant; Kᴀᴍᴄᴏ Sᴜᴘᴘʟʏ Cᴏʀᴘ. ᴏꜰ Bᴏsᴛᴏɴ et al., Third-Party Defendants-Respondents, et al., Third-Party Defendant.

Second Department, March 22, 2017

**APPEARANCES OF COUNSEL**

*Kaye Scholer, LLP*, New York City (*James M. Catterson* of counsel), and *Pollack, Pollack, Isaac & DeCicco, LLP*, New York City (*Brian J. Isaac* of counsel), for defendant/third-party plaintiff-appellant and additional third-party plaintiff-appellant.

*Cullen and Dykman LLP*, New York City (*Cynthia Boyer Okrent* of counsel), for plaintiff/third-party defendant-respondent and third-party defendants-respondents, and *Blank Rome LLP*, New York City (*Jacqueline W. Silbermann* and *Daniel E. Rhynhart*, of the Pennsylvania bar, admitted pro hac vice, of counsel), for third-party defendant-respondent Kamco Building Supply Corp.

## OPINION OF THE COURT

CHAMBERS, J.P.

This appeal presents a rare opportunity to consider the circumstances under which a party's conduct, in the course of performing what may be described as a relational contract,[1] may support an inference that a material right under the contract has been prospectively waived.

### I.

The additional third-party plaintiff, Southeastern Metal, Inc. (hereinafter SEM), and the defendant/third-party plaintiff, On the Right Track, LLC (hereinafter OTRT), are, respectively, a licensee and sublicensee of a patented self-locking stud, track, and header partitioning system used in the construction industry and marketed as "Trakloc," which is owned by the third-party defendant Trakloc International, LLC (hereinafter TI).

In 2005, OTRT, SEM, and TI entered into two supply distribution agreements (hereinafter the agreements) with the plaintiff/third-party defendant, Kamco Supply Corp., and the third-party defendants Kamco Supply Corp. of Boston, Kamco Supply Corp. of New England, and Kamco Building Supply Corp.[2] (hereinafter collectively the Kamco parties). The agreements required the Kamco parties to purchase a minimum of

---

1.   The term "relational contract" was coined by the late Ian Roderick Macneil to describe the opposite of a discrete transaction (*see generally* Ian R. Macneil, *Relational Contract Theory: Challenges and Queries*, 94 Nw U L Rev 877 [2000]; Ian R. Macneil, *Relational Contract: What We Do and Do Not Know*, 1985 Wis L Rev 483 [1985]). A relational contract has also been described as "a contract that involves not merely an exchange, but also a relationship, between the contracting parties" (Melvin A. Eisenberg, *Why There Is No Law of Relational Contracts*, 94 Nw U L Rev 805, 816 [2000]), as well as a contract that "creates a continuing relationship flexible enough to adapt to changes of circumstance that could not have been fully anticipated when the contract was negotiated" (*United States v Moreland*, 703 F3d 976, 985 [7th Cir 2012]). With its emphasis on trust, collaboration, reputation, and the ability to adapt in the face of changing circumstances, the relational contract has been extensively studied by economists, sociologists and game theorists, but thus far has generated little interest among lawyers (*see generally* Eisenberg, 94 Nw U L Rev 805).

2.   The agreement with Kamco Building Supply Corp. was entered into on October 14, 2005, whereas the agreement with the other Kamco parties was entered into on July 19, 2005. Although Kamco Building Supply Corp. was not a party to the July 2005 agreement, the evidence at trial established that the minimum purchase requirements in the July 2005 agreement were intended to apply collectively to all of the Kamco parties, including Kamco Building Supply Corp., but that Kamco Building Supply Corp. decided at

15 million linear feet of Trakloc by December 31, 2005. For the calendar year 2006, the agreements required the Kamco parties to purchase an annual minimum of 164.4 million linear feet of Trakloc, and, in the course of satisfying that annual minimum purchase requirement, to purchase a minimum of 8 million linear feet of Trakloc in each month of 2006. The agreements also required the Kamco parties to use their "best efforts" to market, sell, and distribute Trakloc within the relevant territory and to increase sales volumes annually.

Each agreement also contained the following no-oral-waiver provision:

> "19.2 Waiver. No waiver of any provision of this Agreement or any rights or obligations of either party hereunder shall be effective, except pursuant to written instrument signed by the party or parties waiving compliance. This waiver shall be effective only in the specific instance and the specific purpose stated."

The agreements were set to expire on December 31, 2006, but would be renewed automatically for additional one-year terms as long as the Kamco parties met the minimum purchase requirements.

It is undisputed that the Kamco parties did not meet their annual minimum purchase requirement for 2005, or any of their monthly minimum purchase requirements for 2006. According to SEM's records, the Kamco parties purchased only 1,565,406 linear feet of Trakloc in 2005, and only 2,064,263 linear feet of Trakloc in 2006—just over 2% of the combined minimum annual purchase requirements for 2005 and 2006. While SEM and OTRT periodically complained to the Kamco parties, mostly orally, about the low sales figures, the Kamco parties placed the blame on a number of problems outside their control, including shipping, logistics, and pricing issues attributable to SEM.

---

the last minute not to sign the July 2005 agreement. The evidence further established that the collective minimum purchase requirements in the July 2005 agreement were not reduced to account for the fact that Kamco Building Supply Corp. was not a party to that agreement and had entered into its own agreement, which contained separate minimum purchase requirements applicable only to it. Since the parties, throughout this litigation, have effectively treated the minimum purchase requirements as one collective obligation shared by all of the Kamco parties, and since it is undisputed that the Kamco parties failed to meet any of the agreements' minimum purchase requirements, as a matter of convenience, only the minimum purchase requirements in the July 2005 agreement will be referenced in this opinion.

In April or May 2006, Kamco Supply Corp.—the Kamco entity responsible for the New York market—approached OTRT about ending the relationship. By July 2006, the operating member of OTRT conceded that there was no "realistic possibility" that the Kamco parties would be able to meet their annual minimum purchase requirement for 2006. At that point, Kamco Supply Corp. and OTRT agreed that Kamco Supply Corp. would return $47,709.92 worth of Trakloc to SEM.

At no time up to that point, or even during the following several weeks, did anyone at OTRT or SEM ever send the Kamco parties a notice of default regarding their failure to meet the minimum purchase requirements, or a reservation of OTRT's and SEM's rights to seek damages for past breaches or require strict compliance with such requirements going forward. According to SEM's president, no default notice was sent because there was no desire to terminate the agreements with the Kamco parties, as SEM and OTRT still felt that the best chance of success was to press ahead in the hope that sales might eventually improve.

In November 2006, less than two months before the scheduled expiration of the agreements, Kamco Supply Corp. commenced this action against OTRT seeking to recover damages for breach of contract. OTRT asserted counterclaims, and, in a third-party action against the Kamco parties and TI, OTRT and SEM sought to recover substantial damages for the Kamco parties' failure to meet the minimum purchase requirements under the agreements.

At the conclusion of a nonjury trial, the Supreme Court resolved the counterclaims and the third-party action in favor of the Kamco parties and against OTRT and SEM. The court found that the Kamco parties had met their "best efforts" obligation under the agreements, and that finding is not challenged by OTRT and SEM on this appeal. While the court also found that the minimum purchase requirements were binding, and that the Kamco parties had consistently failed to meet them, it concluded, in relevant part, that OTRT and SEM had no right to sue for the breach. Specifically, the court found that the parties' course of performance supported the view that the Kamco parties' persistent and repeated failure to meet minimum purchase requirements was "a non-actionable mutual failure to live up to expectations." As for the no-oral-waiver clause (*see* section 19.2 of the agreements, quoted in part I, *supra*), the court held that it was not dispositive, as "[t]he

factual question of whether waiver occurred may be determined by consideration of words or conduct."

OTRT and SEM moved pursuant to CPLR 4404 (b), in effect, to set aside so much of a judgment entered upon the decision as dismissed the counterclaims and the third-party complaint insofar as asserted against the Kamco parties. They argued that the evidence presented at trial did not support an inference that they had waived their contractual right to enforce the minimum purchase requirements under the agreements. Alternatively, they argued that even if partial waivers of the 2005 annual minimum and 2006 monthly minimum purchase requirements had occurred, OTRT and SEM were still entitled to enforce the 2006 annual minimum purchase requirement, which was still executory at the time the counterclaims and the third-party action were asserted. The Supreme Court disagreed and denied the motion, giving rise to this appeal.

## II.

The general principles relating to the law of waiver and estoppel in New York are well known.

"Once a contract is formed, the parties may of course change their agreement by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel" (*CT Chems. [U.S.A.] v Vinmar Impex*, 81 NY2d 174, 179 [1993]; *see* UCC 2-208, 2-209). Thus, "[c]ontractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned," and "[s]uch abandonment may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage" (*Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Mgt., L.P.*, 7 NY3d 96, 104 [2006] [internal quotation marks omitted]).

As the intentional relinquishment of a known right, a waiver "should not be lightly presumed" (*Gilbert Frank Corp. v Federal Ins. Co.*, 70 NY2d 966, 968 [1988]). Ordinarily, mere "[n]egligence, oversight or thoughtlessness" does not create a waiver (*Alsens Am. Portland Cement Works v Degnon Contr. Co.*, 222 NY 34, 37 [1917]). Similarly, "a party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future" (*Seven-Up Bottling Co. [Bangkok], Ltd. v PepsiCo, Inc.*, 686 F Supp 1015, 1023 [SD NY 1988] [applying New York law]).

A waiver, however, may be proved by "undisputed acts or language so inconsistent with [the party's] purpose to stand upon his [or her] rights as to leave no opportunity for a reasonable inference to the contrary" (*Alsens Am. Portland Cement Works v Degnon Contr. Co.*, 222 NY at 37).

### III.

In the context of relational contracts such as the subject agreements, where there are repeated occasions for performance over the course of months or years, the application of general principles of waiver and estoppel presents special difficulties, particularly when trying to gauge whether a waiver relates only to a contemporaneous or past obligation, or applies prospectively to executory obligations as well. And when no-oral-waiver clauses are thrown into the mix, the analysis becomes even more complex (*see generally* David V. Snyder, *The Law of Contract and the Concept of Change: Public and Private Attempts to Regulate Modification, Waiver, and Estoppel*, 1999 Wis L Rev 607 [1999]).

In approaching this question, it is useful to recall that the roots of waiver lie firmly in equity, and are "designed to prevent the waiving party from lulling the other party into a belief that strict compliance with a contractual duty will not be required and then either suing for noncompliance or demanding compliance for the purpose of avoiding the transaction" (13 Richard A. Lord, Williston on Contracts § 39:15 at 621 [4th ed 2013] [footnotes omitted]).

Where, as here, a contract provides, among other things, for the long-term supply of goods, UCC 2-208 and 2-209 also come into play. Those sections read, in relevant part, as follows:

"2-208. Course of Performance or Practical Construction

"(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

"(2) The express terms of the agreement and any such course of performance . . . shall be construed

whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance . . .

"(3) Subject to the provisions of the next section on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."

"2-209. Modification, Rescission and Waiver . . .

"(4) Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) [relating to certain requirements for a signed writing] it can operate as a waiver.

"(5) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver."

Under the above provisions, a party may, through its course of performance, waive a term of the contract, either retrospectively (i.e., in connection with a past obligation or condition) or prospectively (i.e., in connection with an executory obligation). If the waiver applies prospectively, it may be retracted upon reasonable notice, unless such retraction would be unjust in view of a material change of position in reliance on the waiver (*see All-Year Golf v Products Invs. Corp.*, 34 AD2d 246, 249-250 [1970]).

Also relevant to this appeal is the interplay between the concept of waiver and the doctrine of election of remedies. Under the latter, when a party materially breaches a contract, the non-breaching party must choose between two options: it can elect to terminate the contract or continue it. If the non-breaching party chooses to continue to perform or accept performance, it loses its right to terminate the contract based on the prior breach (*see Awards.com v Kinko's, Inc.*, 42 AD3d 178, 188 [2007], *affd* 14 NY3d 791 [2010]).

While courts have occasionally attempted to draw a distinction between a waiver and an election of remedies, these distinctions are mostly a matter of semantics (*see ESPN, Inc. v*

*Office of Commr. of Baseball*, 76 F Supp 2d 383, 388-392 [SD NY 1999]; *Bigda v Fischbach Corp.*, 849 F Supp 895, 901 n 2 [SD NY 1994]). In the ordinary case, an election of remedies is merely a species of waiver. Thus, a party that continues to perform or accept performance despite the failure of a condition precedent established for its benefit may be said—provided that such party's intent is clearly expressed—either to have *elected* to affirm the contract despite the failure of the condition, or to have *waived* the satisfaction of the condition (*see Atkin's Waste Materials v May*, 34 NY2d 422, 427 [1974]; *Avery v Willson*, 81 NY 341 [1880]). Whether viewed as an election or as a waiver, the result is the same: the party is barred from terminating the contract based on the failure of the condition precedent and may be held liable if it subsequently fails to perform (*see generally* 13 Richard A. Lord, Williston on Contracts § 39:31 at 697-698).

However, in the case of a waiver that is deemed broad enough to apply prospectively to an executory obligation, the effect of such a waiver would arguably be broader than that of a mere election. Whereas an election to continue the performance of a contract despite the occurrence of a material breach would bar the right to terminate the contract based on that breach (*see e.g. Albany Med. Coll. v Lobel*, 296 AD2d 701, 703 [2002]), it would not preclude an action based on a subsequent breach (*see AG Props. of Kingston, LLC v Besicorp-Empire Dev. Co., LLC*, 14 AD3d 971, 973 [2005]). By contrast, a prospective waiver of the breached provision would, unless effectively retracted in accordance with UCC 2-209 (5), serve to bar an action based on a subsequent breach of that provision (*see Apex Pool Equip. Corp. v Lee*, 419 F2d 556, 563-564 [2d Cir 1969] [applying New York law]; *see also RBC Nice Bearings, Inc. v SKF USA, Inc.*, 318 Conn 737, 123 A3d 417 [2015]).

## IV.

Applying the above principles to the facts at hand, we find that the record broadly supports the view that OTRT and SEM, by electing early on to continue the agreements despite the Kamco parties' breach of the 2005 annual minimum purchase requirement, waived their right to terminate the agreements based on that initial breach (*see Northeast Sort & Fulfillment Corp. v Reader's Digest Assn.*, 261 AD2d 459 [1999]). Contrary to the Kamco parties' contentions, however, we do not find that such conduct, without more, evinced "a clear manifestation of

intent" prospectively to waive any of the 2006 monthly or annual minimum purchase requirements (*Gilbert Frank Corp. v Federal Ins. Co.*, 70 NY2d at 968; *see EchoStar Satellite L.L.C. v ESPN, Inc.*, 79 AD3d 614, 618 [2010]). The same reasoning also applies to the Kamco parties' continued failure, in early 2006, to meet the monthly minimum purchase requirements. Such conduct can reasonably be understood as a waiver of the 2006 monthly minimum purchase requirements as and when such obligations became due, but not as a prospective waiver of executory minimum purchase requirements, including the 2006 annual minimum purchase requirement.

As time went on, however, and OTRT and SEM continued to accept, month after month, and without any formal reservation of rights or notice of default, the Kamco parties' continued failure to meet monthly minimum purchase requirements, the situation eventually reached a tipping point where the conduct of OTRT and SEM became so inconsistent with an intent to enforce the remaining 2006 minimum purchase requirements "as to leave no opportunity for a reasonable inference to the contrary" (*Alsens Am. Portland Cement Works v Degnon Contr. Co.*, 222 NY at 37). At that point, it can fairly be said that a prospective waiver occurred (*see Apex Pool Equip. Corp. v Lee*, 419 F2d at 563-564; *RBC Nice Bearings, Inc. v SKF USA, Inc.*, 318 Conn at 754-758, 123 A3d at 427-430).

We need not decide precisely when that tipping point happened in this case, as it is clear from the record that it occurred well before OTRT and SEM first attempted formally to enforce their rights under the agreements by asserting counterclaims and the third-party action against the Kamco parties in November or December of 2006.

As early as July of 2006, OTRT had already conceded that there was no "realistic possibility" that the Kamco parties would be able to meet their annual minimum purchase requirement for 2006, yet neither OTRT nor SEM made any effort at that time to put the Kamco parties on notice of their default. On the contrary, OTRT even agreed to allow Kamco Supply Corp. to return $47,709.92 worth of Trakloc to SEM—conduct that is so fundamentally at odds with an intent to enforce the 2006 annual minimum purchase requirement that it would be difficult to characterize it as anything other than a prospective waiver of the annual minimum purchase requirement.

Moreover, by the end of 2006, the Kamco parties' cumulative purchases of Trakloc amounted to barely more than 2% of the

total minimum purchase requirements for 2005 and 2006, leaving a monumental shortfall of 175,770,331 linear feet. At the same time, SEM had only negligible inventories of Trakloc on hand, and its capacity to produce new product was limited to approximately 12 million to 18 million linear feet per month. Thus, even assuming that the Kamco parties had been willing to comply with the 2006 annual minimum purchase requirement in November 2006, it is unreasonable to believe that OTRT and SEM had the capacity to deliver such a large amount of Trakloc in less than two months' time.

For all of the above reasons, we find that the Supreme Court properly concluded that, by the end of 2006, the affirmative conduct of OTRT and SEM over the previous weeks and months evinced an unmistakable intent to waive the remaining 2006 minimum purchase requirements, including the 2006 annual minimum purchase requirement (see *Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Mgt., L.P.*, 7 NY3d at 104).

Nor can the assertion of OTRT's and SEM's counterclaims and the third-party action against the Kamco parties be construed as an effective retraction of their earlier waiver.

> "A waiver, to the extent that it has been executed, cannot be expunged or recalled, but, not being a binding agreement, can, to the extent that it is executory, be withdrawn, provided the party whose performance has been waived is given notice of withdrawal and a reasonable time after notice within which to perform" (*Nassau Trust Co. v Montrose Concrete Prods. Corp.*, 56 NY2d 175, 184 [1982] [citation omitted]; see UCC 2-209 [5]).

Under the facts presented, it would have been unjust to allow OTRT and SEM to retract their prior waiver within weeks of the deadline to meet the 2006 annual minimum purchase requirement.

Finally, we agree with the Supreme Court that, under the facts presented, the agreements' no-oral-waiver provision (see section 19.2 of the agreements, quoted in part I, *supra*) does not compel a different result. As explained above, the Kamco parties' persistent and repeated failure to meet minimum purchase requirements, coupled with OTRT's and SEM's continued acceptance of such conduct without any reservation or protest until a few weeks before the expiration of the agreements (by which time it was, of course, too late to insist upon strict compliance with the terms of the agreements), equitably

estops OTRT and SEM from invoking the benefit of the no-oral-waiver provision (*compare TSS-Seedman's, Inc. v Elota Realty Co.*, 72 NY2d 1024, 1027 [1988], *and Bethpage Theatre Co. v Shekel*, 133 AD2d 62 [1987], *with Eujoy Realty Corp. v Van Wagner Communications, LLC*, 22 NY3d 413, 426 [2013], *and DeCapua v Dine-A-Mate, Inc.*, 292 AD2d 489, 491-492 [2002]).

The parties' remaining contentions either are without merit or need not be considered in light of our determination.

Accordingly, the order is affirmed.

HALL, DUFFY and BARROS, JJ., concur.

Ordered that the order is affirmed, with one bill of costs.