NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 75

No. 2017-333

| | |
|---|---|
| Estate of Emil Kuhling by Richard W. Kuhling | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Civil Division |
| | |
| Taylor Glaze | February Term, 2018 |

Helen M. Toor, J.

James B. Anderson of Ryan Smith & Carbine, Ltd., Rutland, for Plaintiff-Appellee.

Andre D. Bouffard of Downs Rachlin Martin PLLC, Burlington, for Defendant-Appellant.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **EATON, J.** This appeal arises out of a dispute between Taylor Glaze, a surviving niece of Emil Kuhling, and Emil Kuhling's Estate (Estate) over two agreements between Taylor and Emil, one concerning the transfer of Emil's home and another about Emil's life care. Following a bench trial, the court concluded that Taylor owed and breached a fiduciary duty to Emil regarding the sale of Emil's home and awarded damages but concluded there was no breach of the life-care contract. Taylor appeals both the court's determination that she owed and breached a fiduciary duty to Emil and the court's award of damages and prejudgment interest to Emil Kuhling's Estate. On appeal, Taylor also argues that the Estate lacks standing to assert the breach-of-duty and breach-of-contract claims. The Estate cross-appeals the court's determination regarding a contractual agreement for life care between Taylor and Emil. Because we conclude

that there was no breach of any fiduciary duty by Taylor regarding the sale of the house, we reverse the award to the Estate and remand to the trial court to enter judgment. We affirm the court's determination regarding the life-care contract.

¶ 2. The evidence, in the light most favorable to the court's judgment, is as follows. Emil, a lifelong New Yorker, owned a two-story home in Brooklyn, New York, where he resided throughout his life until 2006. At that time, Emil was ninety-three years old and determined he would need additional care as he aged. Emil lived alone and had no children. Emil's remaining relatives consisted of his brother's children, Taylor Glaze, Suzan Hardin, and Richard Kuhling. Taylor, Suzan, and Richard discussed prospective options for Emil's care, and agreed that Taylor would take Emil into her home in Vermont to provide him with a safe environment surrounded by family. Emil moved to Killington to live with Taylor and her husband in October 2006.

¶ 3. Emil's move to Vermont raised questions about what to do with Emil's New York property. Emil found management of the property from afar to be stressful, and he worried "obsessively" about property maintenance. Emil determined that he would like to sell the property and approached Taylor, a formerly licensed real estate agent, to help him sell the property to a third party. Taylor agreed to do so, and Emil they agreed to compensate her for her time. The court did not find that any compensatory payments were ever made to Taylor for efforts on her part to sell the property.

¶ 4. As early as 2006, Taylor indicated an interest in purchasing the property from Emil—either as a real estate investment that she and her brother Richard could develop together or on her own. The one-story warehouse next to Emil's property had been developed into a five-story apartment in recent years. Richard, however, was not interested in participating in developing the property. In early 2007, a neighboring church offered to purchase the house. The church conducted an appraisal of some nature on the property, which valued the house at $615,000.

2

Based on this appraisal, which was provided to Emil, the church offered to purchase the property for $570,000. Emil rejected the offer.

¶ 5. During the time the church appraised and made an offer on the property, Taylor told Emil that she was also interested in purchasing the house. Taylor informed her sister and brother that she wanted to buy Emil's house. Emil and Taylor discussed her purchase at length and decided to move forward with transferring the property[1] to Taylor instead of selling it to a third party. There is no dispute that Emil was fully mentally competent at all times during the discussions concerning the disposition of his house and its transfer and was capable of understanding his actions. Unlike Taylor, Emil did not have experience in real estate transactions. However, Emil had always maintained that he wanted to split his estate evenly among his nieces and nephew, and he wanted to ensure that the transfer to Taylor resulted in an equitable distribution of his assets amongst the three siblings.

¶ 6. Once Emil and Taylor had agreed that Taylor would acquire the property, she found an attorney to help Emil with the transaction and to prepare all of the necessary paperwork for the transfer. Although Taylor sought out the attorney, all concerned were aware, and it is undisputed, that the attorney represented Emil. The attorney met in private with Emil on two separate occasions and was confident that Emil understood the transaction and "what he was doing." The attorney discussed the possibility of seeking a second appraisal on the property with Emil. Emil did not wish to have the property appraised. Richard Kuhling had previously recommended to Taylor that she should have an appraisal conducted by a Member of the Appraisal Institute (MAI) to understand what the New York property would be worth if sold as commercial real estate. MAI appraisals are estimates generated by appraisers who are experienced in the

___

[1] The parties dispute whether the ultimate transaction between Emil and Taylor was a sale, a gift, or partially a sale and partially a gift. The characterization of the transaction does not affect our decision, and we refer to it throughout as a transfer.

3

valuation and evaluation of commercial, industrial, residential, and other types of properties. After the church's offer, which Taylor considered to be a "lowball offer," Taylor promised to investigate the "real market value" of the property for Emil. There is limited evidence of Taylor's additional research, and she did not have a second appraisal—MAI or other—conducted on the property. Emil believed the value of the house was between $600,000 and $800,000, but the basis for his opinion was never established. Emil agreed to sell the house to Taylor for $600,000 because—as he told his attorney—he believed that, considering the life care Taylor was giving him, it would "all [equal] out."

¶ 7. Based on Emil's estimate of the property value—without getting a second appraisal—Emil and Taylor entered into an agreement to transfer ownership of the property to Taylor. The agreement was as follows: Taylor would assume full responsibility and ownership of the property, removing Emil's concerns for caring for the property and his liability; Taylor would grant Emil a life estate in the property so that he could remain a "New Yorker" in name, if not in actual residence, and Taylor could gain tax benefits in the form of a stepped-up basis for tax purposes when full ownership of the property passed to her as an inheritance upon Emil's death; Taylor "paid" a sum of $600,000 to Emil through an upfront payment of a $300,000 "gift" for Emil to put in an account for Richard and Suzan, a $200,000 advance on her inheritance from Emil, and a $100,000 credit from Emil towards the cost of his end-of-life care in Taylor's home.[2] The $300,000 payment by Taylor had been increased at Emil's insistence from the $250,000 she had originally offered to pay because Emil thought $300,000 was fairer to Richard and Suzan. Between the upfront payment of $300,000 and the credit of $300,000 from Emil ($200,000 from

---

[2] While the agreement between Taylor and Emil did not expressly state that Taylor would provide care for the rest of Emil's life, the court inferred that the contract was to last for the remainder of Emil's life. The court stated that "[a]lthough the letter did not use the words 'for life,' it can only be read that way." The scope of the contract for care between Emil and Taylor is not necessary for our analysis; therefore, we do not address whether the court's construction of the contract was accurate.

Taylor's future inheritance and $100,000 from credit towards Emil's end-of-life care), Taylor acquired title to the property subject to a life estate to Emil for $600,000 on May 7, 2007. Between the date of the transfer in 2007 and Emil's death in 2013, no one questioned Emil's intent to transfer the property to Taylor or whether there was anything about the transaction that was against his wishes, or raised any concern with him that he was being treated unfairly.

¶ 8.    The Estate does not dispute that Taylor provided excellent care for Emil during the seven years from the time he moved into her home until he passed away. Despite Emil's advance of $100,000 toward his end-of-life care in the 2007 transaction, his medical and living expenses ultimately cost $173,000—an additional $73,000 that he paid to Taylor as "rent." Upon Emil's death, Richard Kuhling—as executor of Emil Kuhling's Estate—brought suit alleging: (1) Taylor owed a duty of care to Emil as his agent in selling the property, which she breached by acquiring the property herself without providing Emil with a second appraisal; and (2) Taylor breached the life-care contract that she made with Emil in 2007. The Estate sought damages for both claims. No claim that Taylor exercised undue influence over Emil was made.

¶ 9.    Based on the facts outlined above, the court determined the following. First, regarding the Estate's breach-of-fiduciary-duty claim, the court concluded that Taylor acted as Emil's agent because she agreed to sell the property to a third party for Emil in exchange for compensation. It further held that she breached her duty as Emil's agent when she purchased the property herself and failed to obtain a second appraisal of the property's value, thereby withholding material information from Emil. Due to the breach, the court awarded damages and prejudgment interest to the Estate. Second, the court concluded there was no breach of the life-care contract with Emil because the parties had modified the contract, creating a new agreement, and Taylor's actions were consistent with the modified terms.

¶ 10.    Taylor appeals the court's judgment, asserting that: (1) the Estate lacks standing to bring claims of breach of duty and breach of contract because these claims expired upon Emil's

5

death; (2) the court erred in determining that an agency relationship existed between Taylor and Emil and that a breach of fiduciary duty occurred; and (3) the court's award of damages and prejudgment interest was "excessive" and "speculative." The Estate cross-appeals, challenging the trial court's determination there had been no breach of the life-care contract.

¶ 11.   On appeal, we review the trial court's findings of fact for clear error, and its legal conclusions de novo. See N.A.S. Holdings, Inc. v. Pafundi, 169 Vt. 437, 438-39, 736 A.2d 780, 783 (1999). We conclude that: (1) the Estate had standing to assert the breach-of-duty and breach-of-contract claims; (2) the court erred in concluding that Taylor breached any fiduciary duty to Emil; and (3) no breach of contract occurred. We consider each in turn.

I. Survival Statute and Standing

¶ 12.   The first issue is whether the Estate's claim for breach of fiduciary duty is covered by Vermont's survival statute, 14 V.S.A. § 1451.[3] We determine that the claim survives Emil's death and the Estate has standing to bring a claim for breach of fiduciary duty.

¶ 13.   Under Vermont common law, personal tort actions expire with the death of "the person of the plaintiff or the defendant." Whitchurch v. Perry, 137 Vt. 464, 468, 408 A.2d 627, 630 (1979). However, an executor of an estate may "commence [or] prosecute . . . , in the right of the deceased, actions which survive . . . and are necessary for the recovery and protection of the property or rights of the deceased . . . ." 14 V.S.A. § 1401; see id. § 1451 (listing specific causes of action that survive person's death). The surviving actions include:

> Actions . . . of tort on account of the wrongful conversion of personal estate and actions of tort on account of a trespass or for damages done to real or personal estate shall survive, in addition to

---

[3]   This claim has been variously described by the parties throughout the course of this litigation as a claim for rescission, a claim for money damages in the fiduciary context, and a claim for money damages following a breach of promises. On appeal, both parties refer to this as a claim for breach of fiduciary duty, and we refer to it as such.

the actions which survive by common law, and may be commenced and prosecuted by the executor or administrator.

Id. § 1451 (emphasis added).

¶ 14. On appeal, Taylor asserts the claim of breach of fiduciary duty did not survive Emil's death under 14 V.S.A. § 1451 because the Estate did not bring a claim for conversion of Emil's property or for any damage done to Emil's real or personal property. Taylor asserts the survival statute is intended to apply to damage specific to real or personal estate and not to a claim for breach of fiduciary duty arising out of a real estate transaction. See Davis v. Carpenter, 72 Vt. 259, 259-60, 47 A. 778, 778-79 (1900) (holding tort action for outdated seduction-of-minor-daughter tort does not survive because it does not involve specific personal property); Jones v. Estate of Ellis, 68 Vt. 544, 545, 35 A. 488, 489 (1896) (holding tort action for sale of stock does not survive because it does not involve specific personal property).

¶ 15. When interpreting a statute, we first look to the plain language. Collins v. Collins, 2017 VT 70, ¶ 16, __ Vt. __, 173 A.3d 345 ("We review questions of statutory interpretation without deference, and we enforce the language according to its plain meaning."). Here, the language of the statute is broader than the interpretation advanced by Taylor. We read the language allowing tort claims for damage to the "personal estate" to include allegations of breach of fiduciary duty that would have resulted in a decrease in Estate assets. Thus, we conclude that § 1451 recognizes a broader definition of personal estate, including claims for economic losses arising from breach of fiduciary duty.

¶ 16. This construction is consistent with decisions from this Court and others interpreting this language. See, e.g., Bellows v. Allen's Adm'r, 22 Vt. 108, 108-09 (1849) (stating that § 1451 should be construed liberally regarding "damages done to real and personal estate"); Kindred Nursing Ctrs. E., LLC v. Estate of Nyce, No. 5:16-CV-73, 2016 WL 3476414, at *3 (D. Vt. June 21, 2016) (finding fraudulent-transfer claim survives); Estate of Alden v. Dee, No. 427-

7

12-06 Bncv, 2009 WL 6356587 (Vt. Super. Ct. Nov. 3, 2009) (holding claims for misappropriation of trust funds by trustee survived trustee's death). In <u>Thrasher v. Melvin</u>, the U.S. District Court for the District of Vermont, applying Vermont's substantive law, analyzed § 1451 and held that breach of fiduciary duty claims do not abate under Vermont's survival statutes. No. 2:07–CV–53, 2008 WL 2434224, at *1-3 (D. Vt. June 12, 2008). The plaintiff in <u>Thrasher</u> brought claims for breach of fiduciary duty, fraud, and conversion against her mother and stepfather. The stepfather died several months after plaintiff commenced the action. The court denied the motion to strike stepfather as a party to the case based on his death, holding that plaintiff's claims for breach of fiduciary duty and fraudulent conversion "clearly fall within the plain meaning" of § 1451. <u>Id</u>. The District Court's analysis in <u>Thrasher</u> agrees with our conclusion that the breach of fiduciary duty claim constitutes a claim for damages done to personal estate under § 1451 and survives Emil's death. Thus, as executor of Emil's Estate, Richard Kuhling has standing to assert Emil's breach of fiduciary duty claim against Taylor on behalf of the Estate.

## II. Existence and Breach of Duty

¶ 17.    Next, we address whether Taylor owed a fiduciary duty to Emil when she undertook to help him sell his property, or when Emil transferred it to her, and, if so, whether she breached that duty. We begin by considering whether an agency relationship existed.[4] "Whether a

---

[4] Although this Court has followed the Restatement (Second) of Agency in numerous cases in the past, see <u>Doe v. Forrest</u>, 2004 VT 37, ¶ 21, 176 Vt. 476, 853 A.2d 48 ("We have routinely adopted provisions of the Restatement (Second) of Agency as reflecting the common law of Vermont."), a growing number of our cases and cases from other jurisdictions reference the more recent Restatement (Third) of Property. See <u>Kuligoski v. Rapoza</u>, 2018 VT 14, ¶¶ 13-14, __Vt. __, 183 A.3d 1145 (applying Restatement (Third) of Agency); <u>Felis v. Downs Rachlin Martin PLLC</u>, 2015 VT 129, ¶¶ 21-23, 200 Vt. 465, 133 A.3d 836 (applying Restatement (Third) of Agency to alleged self-dealing by agent); <u>Mann v. Adventure Quest, Inc.</u>, 2009 VT 38, ¶ 11 n. 3, 186 Vt. 14, 974 A.2d 607 (applying, but not adopting, Restatement (Third) of Agency when referencing either Restatement (Second) or Restatement (Third) would result in same outcome); see also <u>In re Estate of Waterman</u>, 847 N.W.2d 560, 574 (Iowa 2014) (applying Restatement (Third) of Agency law to evaluate that "recurring contact and familial relationship alone" do not create agency relationship); <u>Hass v. Wentzlaff</u>, 2012 SD 50, ¶ 21 n.3, 816 N.W.2d 96 ("Restatement (Third) of Agency, adopted in 2005 and published in 2006, now supersedes

relationship is one of agency is a legal conclusion made after an assessment of the facts of the relationship and the application of the law of agency to those facts." Restatement (Third) of Agency § 1.02 cmt. a (2006). Under Vermont law, an agency relationship arises when: (1) "one party consents to another party acting as its agent"; (2) "the agent acquiesce[s] to the arrangement"; and (3) the agent is subject to the principal's control. Kimco Leasing Co. v. Lake Hortonia Prop., 161 Vt. 425, 429, 640 A.2d 18, 20 (1993) (quotation omitted). The party asserting that an agency relationship exists generally has the burden in litigation to establish its existence. Segalla v. U.S. Fire Ins. Co., 135 Vt. 185, 188, 373 A.2d 535, 537 (1977); Restatement (Third) of Agency § 1.02 cmt. d.

¶ 18.    Here, the trial court found that: (1) Emil, as principal, manifested his assent to Taylor, as agent, for Taylor to act on his behalf and subject to his control to sell the New York property; and (2) Taylor manifested assent to act as Emil's sales agent.[5]  Based on these facts, the court concluded that an agency relationship existed. We do not reach the question of whether Taylor acted as an agent for Emil and thus owed a fiduciary duty to him because we conclude that no breach of that duty occurred even if such a duty existed.

¶ 19.    When it is demonstrated that one party owes a fiduciary duty to another, the burden shifts to the party against whom the breach is alleged to establish that the principal consented to

---

Restatement (Second) of Agency, which was published in 1958."). Here, we refer to the Restatement (Third), but applying the Restatement (Third) or Restatement (Second) of Agency law has no impact on the outcome of our decision.

[5]  In the alternative, the Estate argues that, even if Emil and Taylor did not enter an actual-authority agency relationship, Taylor and Emil were in a confidential relationship and, thus, Taylor owed Emil a fiduciary duty. "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Cooper v. Cooper, 173 Vt. 1, 7, 783 A.2d 430, 436 (2001) (quotation omitted). For a fiduciary duty to arise, "the relationship had to ripen into one in which [one party was] dependent on, and reposed trust and confidence in, [another party] in the conduct of their affairs." Capital Impact Corp. v. Munro, 162 Vt. 6, 10, 642 A.2d 1175, 1177 (1992).

his or her acts. Restatement (Third) of Agency § 8.06 cmts. b, c. Self-dealing by a fiduciary is permissible, but only with the principal's consent and full knowledge of material information:

> Conduct by an agent that would otherwise constitute a breach of duty . . . does not constitute a breach of duty if the principal <u>consents</u> to the conduct, provided that
>
> (a) in obtaining the principal's consent, the agent
>
> (i) acts in good faith,
>
> (ii) discloses all material facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them, and
>
> (iii) otherwise deals fairly with the principal . . . .

<u>Id</u>. § 8.06(1) (emphasis added); see also <u>Ramsay v. Toelle</u>, No. 3404-S, 2008 WL 4570580, at *7 (Del. Ch. Sept. 30, 2008) ("[A] fiduciary may engage in a self-dealing transaction involving her principal, but only where the principal has consented to the self-dealing after full disclosure by the fiduciary."); Restatement (Third) of Agency § 8.06 cmt. c ("A principal may consent to an agent's receipt of a material benefit in connection with a transaction conducted . . . on the behalf of the principal or otherwise through the agent's use of position."). Therefore, the issue here is whether Emil consented to the transaction based on Taylor's full disclosure of the material information regarding the exchange.

¶ 20. The trial court concluded that Taylor breached her fiduciary duty to Emil because she agreed to help Emil sell the New York property and then purchased the property herself without providing him with a second appraisal of the property's value. The trial court found that Emil's consent to the transaction was invalid because, in light of Emil's "lack of sophistication in real estate matters," Taylor could not acquire the property without providing Emil with a second appraisal. The court found the "evidence clearly establish[ed] that Taylor knew the $600,000 price undervalued the property," so she had a duty to advise Emil as such. Applying comment a to § 390

10

of the Restatement (Second) of Agency, the trial court found that Taylor breached her duty because she failed to disclose material information to Emil when she did not obtain a second appraisal for the property prior to purchasing it herself.

¶ 21.    We conclude that Emil's consent to Taylor's alleged self-dealing is valid and that Taylor did not breach a fiduciary duty to Emil, if one existed.

### A.  Emil's Consent and Knowledge of Material Information

¶ 22.    Our case law demonstrates that a principal may consent to an intrafamilial transaction benefiting a self-dealing agent, such as the one here, if the principal is competent and possessed the requisite knowledge regarding the transaction prior to its occurrence.  Notably, this Court considered consent in the context of intrafamilial transactions in Lamson v. Lamson, 2017 VT 41, __ Vt. __, 168 A.3d 454, and In re Estate of Kurrelmeyer, 2010 VT 20, 187 Vt. 620, 992 A.2d 316 (mem.).  In Lamson, the Court addressed whether a co-beneficiary breached a fiduciary duty to his aging mother, the grantor of the trust, when he distributed trust assets for his personal benefit.  We determined that no breach occurred because the mother/grantor consented to her son's conduct when she "actively participated in every step of [the] series of transactions" leading to the distribution "well before the probate division appointed a guardian for her."  2017 VT 41, ¶ 25. Similarly, in Estate of Kurrelmeyer, we addressed whether a wife breached her fiduciary duty as power of attorney for her husband, the decedent, when she engaged in self-dealing by transferring estate property into a trust.  2010 VT 20, ¶ 12.  We held that the wife's self-dealing did not constitute a breach of her fiduciary duty when the wife's distribution of the trust assets was "in accord" with the decedent's intent.  Id.  In finding there was no breach, the Court emphasized that the decedent was competent at the time of his estate planning; he discussed his estate plans with an attorney and structured them to "provid[e] greater financial support for wife than decedent's will provided"; and wife took "precisely" the type of action anticipated by her husband.  Id. ¶¶ 4, 12.

11

¶ 23.   Thus, when considering a principal's ability to give valid consent to an agent's self-dealing—as we do here—our caselaw instructs us that a principal's requisite knowledge for a transaction may be derived from the principal's participation in shaping a transaction, the presence of legal counsel acting on behalf of the principal, and clear statements of the principal's intent in structuring the transaction—even if that intent is to expressly allow self-dealing by a beneficiary. Although Emil was elderly, no one contends that he was incompetent to dispose of his property or that any undue influence was brought to bear to induce him to transfer his property to Taylor.

¶ 24.   In light of the above considerations, we conclude that the facts demonstrate that Emil had the requisite knowledge to enter the transaction.  As in Lamson and Estate of Kurrelmeyer, Emil was integral in shaping the transaction with Taylor, he did so with the advantage of counsel, and he intended to structure the transaction in a manner that would benefit Taylor in exchange for her care.  For example, in discussion with his attorney, Emil increased Taylor's payment from $250,000 to $300,000 to set aside a larger sum for Richard and Suzan. Emil set the terms of the transaction.  In his visits with the attorney, Emil also expressly stated that, although he believed the property was worth between $600,000 to $800,000, he did not want a second appraisal to determine its true value, specifically declining one when asked by his attorney.  Instead, he wanted to give Taylor the benefit of the bargain and transfer the property to Taylor for $600,000—the lowest property value, in his estimate—because he believed that the value of the property and the value of her care for him would "equal out."  Emil knew that he could obtain an appraisal; he chose not to.  Because Emil chose not to seek a second appraisal, and for additional reasons explained more fully below, we disagree with the trial court's conclusion that Taylor breached any duty by failing to obtain a second appraisal.

¶ 25.   Conspicuously lacking from the record are conversations between Emil and his family regarding the transaction, or any indication that he was unhappy or felt deceived in retrospect.  Richard and Suzan had the opportunity over many years to ask Emil if he entered the

transaction without full information, Taylor even encouraged them to do so, but they elected not to challenge the transaction until after Emil's death.

## B. Full Disclosure of Material Information

¶ 26.    An agent has a fiduciary duty to tell the principal if she has an adverse interest in the fiduciary relationship and to fully disclose any material information that might affect the principal's decision making.  Restatement (Second) § 390; Restatement (Third) § 8.06(1)(a)(ii). Based on our prior case law, the Restatements (Second) and (Third) of Agency law, and case law from other jurisdictions, we conclude that Taylor did not breach any duty to Emil.

¶ 27.    Taylor disclosed her adverse interest in the property to both Emil and the rest of her family; it was no secret that she wanted to purchase Emil's New York property.  She discussed co-purchasing and developing the property as a joint venture with Richard, and after purchasing the property from Emil, she told her siblings that she had acquired the property and told them to ask Emil if they had any questions regarding the transaction, which they declined to do.[6]  She met her burden in this respect.

¶ 28.    Taylor argues that the trial court erred in concluding that the true value of the New York property was material information that would affect Emil's decision-making in the transaction, and, therefore, Taylor's failure to provide Emil with an appraisal showing the property's true value constituted a breach.  This Court has had limited opportunities to consider whether a fiduciary duty was breached due to an agent's failure to disclose material information in the context of intrafamilial transactions.  However, caselaw from this Court and other jurisdictions indicates that the principal has the authority to determine what information is material

---

[6]  Given that Emil was competent and acting on his own accord, other family members, including potential beneficiaries of his estate upon his death, were not legally entitled to any particular disclosures by Taylor about her interest in purchasing the property or the fact that she ultimately did.  Her fiduciary duty, if any, ran only to Emil.  We note the fact that she discussed her interest in purchasing the property and her acquisition of it with her siblings only to highlight that she did not conduct those activities in secret.

13

and requires disclosure, and that the agent does not have an obligation to affirmatively seek out new information that would otherwise be material if the principal does not wish to know that information.

¶ 29. In the context of real estate transactions, this Court has held that the principal's determination regarding what information is material to the transaction is controlling. E. A. Straut Realty Agency, Inc. v. Wooster, 118 Vt. 66, 70, 99 A.2d 689, 1692 (1953) (noting that agent "is bound to follow the directions of his principal" and "[i]n the absence of a special agreement, it is the principal's judgment, and not the agent's, that is to control"). The agent cannot unilaterally determine that the principal does not require certain material information, id., and the principal must be given sufficient information such that the principal is put on "equal footing" with the agent. See Osborn v. Griffin, No. 2011-89, No. 2012-32, 2016 WL 1092672 at * 28 (C.D. Ky March 21, 2016) (holding that brothers breached fiduciary duty to sisters in family dispute over parents' estate when brothers engaged in self-dealing and failed to advise sisters to get counsel, inform sisters of potential legal claims available to them, or disclose stock transactions or sale of estate property); Kirkuff v. Wisegarver, 697 N.E.2d 406, 411-12 (Ill. App. Ct. 1998) (finding breach of fiduciary duty when real estate broker purchased land from trustee without disclosing potential costs and profits of developing property that were known to broker).

¶ 30. The Restatement (Second) and (Third) of Agency law explain that an agent may act as an adverse party with the principal's consent, as long as the agent discloses facts that the "agent knows or should know would reasonably affect the principal's judgment, unless the principal has manifested that he knows such facts or . . . does not care to know them." Restatement (Second) of Agency Law § 390 (1958); see also Restatement (Third) of Agency 8.06(1)(a). Both Restatements offer qualifiers to this scenario. For example, Restatement (Second) § 390 comment a explains that, when a principal has limited business experience, an agent cannot fail to disclose material information "merely because the principal says [he or she] does not care for it"—rather,

14

the agent must "reasonably believe[] that the principal understands the implications of the transaction." Comment b provides that "if the principal manifests that [he or she] knows all material facts or, if [he or she] is a person of mature judgment, is willing to deal without knowing them, the agent is not liable if [he or she] fails to reveal them." Comment c further clarifies that if the agent "is one upon whom the principal naturally would rely on for advice" and fears he or she cannot provide the principal impartial guidance, then the agent has a duty to "see that the principal seeks the advice of a competent and disinterested third person." Finally, comment a to Restatement (Third) § 8.06 explains that "[t]he validity of the principal's consent [to an agent's self-dealing] turns in many respects on the agent's conduct in obtaining it."

¶ 31.    In summary, the Restatements provide that, so long as the agent ensures the principal understands the implications of not obtaining certain types of information, the agent is not liable for not providing that information. If the agent cannot secure the principal's full understanding, she is obligated to obtain independent counsel for the principal.

¶ 32.    Caselaw from other jurisdictions also supports the conclusion that a principal may waive the right to certain information material to a transaction. See Arthur D. Little Int'l., Inc. v. Dooyang Corp., 928 F. Supp. 1189, 1208 (D. Mass. 1996) (recognizing business consulting service/agent's duty to disclose all facts which would affect corporate employer/principal's judgment in permitting agent's adverse interest to transaction, unless principal manifested that it knew such facts or did not care to know them); Lerner v. DMB Realty, LLC, 322 P.3d 909, 920 (Ariz. Ct. App. 2014) (concluding that real estate broker representing both parties in transaction did not breach duty to disclose material information that subject property was within vicinity of sex offender because "with the client's informed consent and in absence of fraud, . . . the duties a broker owes its client may be limited by contract").

¶ 33.    With this legal background, we conclude that Taylor did not breach any duty to Emil. Notably, although Taylor did not provide Emil with a second appraisal, she did not seek a

15

second appraisal for herself either. Neither one of them knew what the actual value of Emil's property was. There is no evidence in the record that Taylor knew or gave Emil false information regarding the property's value, or that she tried to develop the property prior to the transaction. Cf. Kirkuff, 697 N.E.2d at 406 (holding real estate broker breached fiduciary duty when broker purchased land from trustee without disclosing potential costs and profits of developing property that were known to broker). As explained above, the principal has the authority to waive material information if he understands the implications of the waiver. Emil believed that he knew the value of his property—$600,000 to $800,000. He told Taylor and his attorney he did not want a second appraisal. While Emil was not well-versed in the "business" of real estate transactions, he was a competent individual who wanted to forgo the second estimate and proceed with the transaction based on his estimated value of the property.

¶ 34.    In addition, and significantly, Taylor secured independent counsel who met with Emil on two separate occasions to ensure he understood the transaction and had impartial guidance from a competent and disinterested third person. That attorney asked Emil if he wanted an appraisal and he declined.

¶ 35.    Thus, Emil was sufficiently informed such that he was "on equal footing" with Taylor; Taylor's conduct does not invalidate Emil's consent to the transaction; and she did not breach any duty by failing to provide him with a second appraisal after Emil determined—with the benefit of counsel—that he did not want one.

¶ 36.    In sum, we conclude that no breach occurred because Taylor disclosed the material information that she knew pertaining to the transaction to Emil, Emil determined in consultation with his attorney that he did not want a second appraisal, and Emil consented to the transaction. Accordingly, we reverse the trial court's determination on this issue and remand to the trial court to enter judgment for Taylor consistent with this opinion.

16

¶ 37.   The Estate cross-appeals the lower court's determination that the life-care agreement between Taylor and Emil had been modified and not breached.  The trial court found an agreement between Taylor and Emil that, as part of the 2007 transfer of the property, Taylor would provide end-of-life care for Emil in exchange for a $100,000 credit against the property's sale value.  However, the court determined that Taylor and Emil modified the contract for life care through the course of their dealings.  As a result, Emil made additional payments to Taylor.

¶ 38.   It is well established that parties can modify contractual agreements with one another through the course of performance or dealings.  Powers v. Rutland R. Co., 88 Vt. 376, 394, 92 A. 463, 470 (1914) ("The law of modified or substituted contracts is well settled. The parties to a written contract not under seal, at any time before a breach of it, by a new contract not in writing, may waive, dissolve or annul the former agreement, or in any manner add to, subtract from, or vary or qualify, its terms, and thus make a new contract. . . .  It is not necessary that there be an express agreement of modification or substitution; a new agreement may be implied from the conduct of the parties."); see also Franklin Life Ins. Co. v. Davy, 753 So. 2d 581, 586 (Fla. Dist. Ct. App. 1999) ("[Contracts] may be modified by course of dealings."); Kamco Supply Corp. v. On the Right Track, LLC, 49 N.Y.S. 3d 721, 726 (App. Div. 2017) ("Once a contract is formed, the parties may of course change their agreement by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel." (citation omitted)).

¶ 39.   The Estate fails to demonstrate that the trial court erred in finding that the contract was modified, and the Estate does not allege that the modified contract was breached.  Although Taylor charged Emil additional fees for his life care, notwithstanding their original agreement that she would provide such care for a $100,000 credit toward her purchase of the property, Taylor and Emil modified their agreement through the course of their performance.  Despite evidence that he felt pressured into paying and purposely made payments from funds that would otherwise have

gone to Taylor after his death, Emil nonetheless made the additional payments to Taylor. The trial court's findings are supported by the evidence. Accordingly, we affirm the trial court's conclusion that no breach of contract occurred.

¶ 40.　Because we hold the Estate is not entitled to damages under either the breach-of-fiduciary-duty or breach-of-contract theories, we need not discuss issues related to the calculation of damages.

We reverse the trial court's holding regarding breach of fiduciary duty and its award of damages and remand the matter for the court to enter judgment consistent with this opinion. We affirm the court's determination that no breach of the life-care contract occurred.

FOR THE COURT:

_____
Associate Justice

18