*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  April 2, 2015                    519475
_____

CARTER HOAD, an Infant, by His
    Mother and Guardian,
    CHARLENE HOAD,
                        Respondent,

           v                              MEMORANDUM AND ORDER

LAWRENCE A. DOLKART et al.,
                        Appellants.
_____

Calendar Date:  February 18, 2015

Before:  Peters, P.J., Lahtinen, Garry and Lynch, JJ.

                    _____


        Levene Gouldin & Thompson, LLP, Binghamton (John J. Pollock
of counsel), for Lawrence A. Dolkart, appellant.

        Kaufman Borgeest & Ryan, LLP, New York City, and Sayes &
Evans, Elmira, for Arnot Ogden Medical Center, appellant.

        Fitzgerald & Fitzgerald, PC, Yonkers (Mitchell Gitten of
counsel), for respondent.

                    _____


Lynch, J.

        Appeal from an order of the Supreme Court (O'Shea, J.),
entered September 23, 2013 in Chemung County, which denied
defendants' motions for summary judgment dismissing the
complaint.

        On September 11, 2004, Charlene Hoad, who was in her 29th
week of pregnancy, went to a local emergency room, but was
transferred to defendant Arnot Ogden Medical Center (hereinafter
AOMC) shortly after midnight once it was confirmed that she had a

premature spontaneous rupture of membranes.  Upon arrival at
AOMC, Hoad was examined by defendant Lawrence A. Dolkart, who
placed a fetal heart monitoring (hereinafter FHM) device on her
at approximately 1:00 a.m.  Because plaintiff (hereinafter the
infant) was in breech position, Dolkart advised that the infant
would need to be delivered by cesarean section once labor
started.  Based on an ultrasound performed at approximately 1:50
a.m., Dolkart determined that labor had not begun, and Hoad was
transferred to the maternity ward.  FHM was continued until about
3:10 a.m.  At approximately 8:30 a.m., Hoad complained of some
cramping and Dolkart examined her at about 9:23 a.m.; at his
direction, FHM was resumed at 9:40 a.m.  At 10:30 a.m., Dolkart
examined Hoad, determined that labor had started and directed
that she be prepared for a cesarean section.  An episode of
possible bradycardia was recorded at approximately 10:50 a.m.,
lasting until at least 10:55 a.m.  Hoad was transferred to labor
and delivery at 11:00 a.m., and the infant was born at 12:05 p.m.
Unfortunately, the infant was diagnosed with a brain injury known
as periventricular leukomalacia (hereinafter PVL), which resulted
in cerebral palsy.

       The infant, by Hoad, thereafter commenced this medical
malpractice action against AOMC and Dolkart.  By disclosure
pursuant to CPLR 3101 (d) (1), three experts were identified who,
as relevant here, would opine that Dolkart failed to adequately
monitor the infant and Hoad prior to the infant's birth and that
the cesarean section should have been completed more
expeditiously.  The complaint alleges that, as a result of these
failures, the infant suffered hypoxic ischemic encephalopathy
(hereinafter HIE) during labor and delivery, which deprived his
brain of blood flow and oxygen and caused the PVL.  Defendants
moved for summary judgment dismissing the complaint.  Finding
questions of fact, Supreme Court denied the motions, and
defendants now appeal.

       On his motion for summary judgment, Dolkart bore the
initial burden of "present[ing] factual proof . . . establishing
that [he] complied with the accepted standard of care or did not
cause any injury to the [infant]" (Cole v Champlain Val.
Physicians' Hosp. Med. Ctr., 116 AD3d 1283, 1285 [2014]).  To
this end, Dolkart submitted his own affidavit wherein he detailed

the treatment that he provided to Hoad upon her admission to AOMC and opined that his treatment did not deviate from the applicable standard of care (see id.). Dolkart also submitted an affidavit by John T. Nosovitch Jr., a physician certified in obstetrics and gynecology, who opined that once Hoad's membranes ruptured, the infant's premature birth was inevitable and Dolkart acted within the standard of care by attempting to prolong the pregnancy, limiting vaginal examinations and watching for signs of infection and labor. Further, according to Nosovitch, as the FHM was initially unremarkable, it was within the standard of care to discontinue the FHM and observe Hoad until she started to have contractions. In sum, Nosovitch opined with detailed commentary that Dolkart's treatment throughout the labor and delivery was within the standard of care, and that the claim that the PVL was caused by a hypoxic event is not supported by the medical records. He explained that a baby born with HIE would have had certain manifestations of injury that were not present when the infant was born. To the contrary, the infant's pH levels were within normal range, he did not suffer multiorgan system failure, his Apgar scores were considered to be good and he did not suffer any seizures. According to Nosovich, these factors indicate that the infant did not suffer significant oxygen deprivation during labor and delivery.

Dolkart also submitted an affidavit by Joseph Maytal, a pediatric neurologist. Like Nosovitch, Maytal explained that, with Apgar scores of six and eight at one and five minutes after birth, respectively, normal pH levels and normal kidney and liver function, the infant was not born with any evidence of a hypoxic injury during labor and delivery. Further, Maytal explained that, from the time the infant was born until he was discharged from the hospital on October 29, 2004, he showed no signs of neurological deficits and, based on ultrasound images of his brain, there was no sign of PVL until October 25, 2004. Maytal opined that it was "inconceivable" that the infant's condition was caused by an event that occurred during labor and delivery. Instead, he opined that the PVL resulted from his prematurity and lung immaturity.

There is no dispute that Supreme Court properly determined that Dolkart's submissions were sufficient to demonstrate

entitlement to summary judgment, and that the burden shifted to the infant to present expert medical evidence establishing both that Dolkart deviated from the standard of care and that such deviation was a proximate cause of the infant's injuries (see id. at 1286; Longtemps v Oliva, 110 AD3d 1316, 1318 [2013]). To this end, the infant submitted an affidavit from an obstetrician, Bruce Halbridge, and affirmations by Daniel Adler, a pediatric neurologist, and J. Robert Kirkwood, a neuroradiologist. According to Kirkwood, PVL can be caused by prematurity or impaired blood flow in a preterm fetus that leads to ischemia within the brain. Kirkwood opined that the evidence of brain edema shown in the September 13, 2004 ultrasound images of the infant's brain was the initial appearance of the severe PVL discovered on October 27, 2004. According to Kirkwood, with this evidence of edema that did not change appreciably on the ultrasound images obtained on September 16, 2004 and September 23, 2004, and the absence of hemorrhage, the ischemic event occurred while the infant was in utero and the PVL was not the result of postbirth respiratory distress due to his prematurity. For his part, Adler specifically refuted Dolkart's claim that any hypoxic or ischemic injury during labor and delivery was belied by the infant's condition at birth, explaining that premature babies without mature cerebrovascular systems — like the infant — have "low and slow blood flow" in the brain, such that any degree of cerebral hypoxia could injure the central nervous system before it would affect pH levels and Apgar scores or cause organ failure.

With reference to the medical records, Halbridge opined that Dolkart deviated from the standard of care by failing to provide continuous FHM, by failing to recognize that the FHM indicated an "ischemic insult" to the infant's brain and by failing to order an immediate cesarean section. In Halbridge's view, Hoad would not necessarily have felt contractions and, without FHM, it was not possible to tell when labor actually began. He explained that, when Dolkart ordered the cesarean section at 10:30 a.m., because Hoad's cervix was already dilated three to four centimeters, it was probable that she had been in labor for more than two hours. Halbridge reasoned that Dolkart's failure to order continuous FHM was inconsistent with his plan to deliver the infant promptly once labor began.

As to causation, Halbridge explained that an episode of bradycardia was recorded at 10:50 a.m., lasting until at least 10:55 a.m.[1]  With reference to both Kirkwood's assessment of the infant's brain ultrasounds and his response to resuscitation after he was born, Halbridge specifically refuted Dolkart's claim that the PVL was caused by prematurity.  Rather, he opined that it was the bradycardia event and the consequent loss of blood flow to the infant's brain that caused an ischemic injury that led to the development of the infant's PVL.  Halbridge's basic premise was that, had Dolkart determined through continuous FHM that Hoad was in labor two hours earlier and performed the cesarean section on an emergent basis, the infant would have been born well in advance of the bradycardia event, which he attributed to compression of the umbilical cord.

In our view, Supreme Court properly denied Dolkart's motion for summary judgment.  Here, the infant's expert proof is not limited to "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice" (Carter v Tana, 68 AD3d 1577, 1580 [2009] [internal quotation marks and citation omitted]).  Rather, his experts base their opinions on the medical records and treatment that was provided to the infant and Hoad.  Viewing the evidence in the light most favorable to the infant, we agree with Supreme Court's determination that there were triable issues of fact with regard to whether Dolkart deviated from the standard of care and whether any such deviation was a proximate cause of the infant's PVL and consequent cerebral palsy (see Cole v Champlain Val. Physicians' Hosp. Med. Ctr., 116 AD3d at 1287-1288; Doucett v Strominger, 112 AD3d 1030, 1033 [2013]; Longtemps v Oliva, 110 AD3d at 1318; Carter v Tana, 68 AD3d at 1579-1580).

Turning to the motion by AOMC, generally, a hospital is not liable for the negligence of independent physicians except on a theory of ostensible or apparent agency (see Hill v St. Clare's

---

[1]  Halbridge explained that the tracing was discontinued until 11:02 a.m., such that the full extent of the bradycardia was between 5 and 12 minutes.

Hosp., 67 NY2d 72, 79 [1986]; Friedland v Vassar Bros. Med. Ctr., 119 AD3d 1183, 1184-1185 [2014]). Put differently, a hospital may be liable "where the hospital's words or conduct communicated to a third-party patient give rise to the appearance and belief that the agent-independent physician possesses authority to act on behalf of the hospital" (St. Andrews v Scalia, 51 AD3d 1260, 1261-1262 [2008]). As the proponent of summary judgment, AOMC "bore the initial burden of establishing that [Hoad] sought care from a specific physician rather than from [AOMC] generally" (Friedland v Vassar Bros. Med. Ctr., 119 AD3d at 1186). Here, AOMC's Vice President of Medical Affairs submitted an affidavit wherein he explained that Dolkart was not an employee, but a tenant with admitting privileges at AOMC. The record confirms that when Hoad was transferred from the emergency room, she consented to a transfer into Dolkart's care at AOMC, not to AOMC generally. In response, no facts or admissible evidence were presented to establish that Hoad reasonably believed that Dolkart was AOMC's employee. We therefore discern no basis for imposing liability based upon a theory of ostensible agency (see King v Mitchell, 31 AD3d 958, 959-961 [2006]).

We further find no basis for the infant's claims against AOMC based on the actions of its professional staff. Generally, a hospital is insulated from liability "when its professional staff follows the orders of private physicians selected by the patient" (Nagengast v Samaritan Hosp., 211 AD2d 878, 880 [1995] [internal quotation marks and citation omitted; see Toth v Community Hosp. at Glen Cove, 22 NY2d 255, 265 [1968]). An exception to this general rule exists "where the hospital staff knows that the doctor's orders are so clearly contraindicated by normal practice that ordinary prudence requires inquiry into the correctness of the orders" (Toth v Community Hosp. at Glen Cove, 22 NY2d at 265 n 3; see Trifiletti v Hee-Young Cheon-Lee, ___ AD3d ___, ___, 2015 NY Slip Op 01856, *1 [2015]). Here, AOMC met its burden through the submission of an affirmation by Sara Jordan, an obstetrician. Jordan opined that there was no indication that continuous FHM was necessary from 3:10 a.m. to 9:23 a.m., and that the nursing staff properly followed Dolkart's orders, none of which was clearly contraindicated. While Halbridge stated that Dolkart should have continued FHM, the infant offered no expert proof that any of Dolkart's orders were

so clearly contraindicated as to require AOMC's professional staff to question his orders — and the infant's counsel conceded as much at oral argument. Accordingly, we find that Supreme Court should have granted AOMC's motion for summary judgment dismissing the complaint against AOMC (see Nagengast v Samaritan Hosp., 211 AD2d at 880-881).

Peters, P.J., Lahtinen and Garry, JJ., concur.


ORDERED that the order is modified, on the law, without costs, by reversing so much thereof as denied the motion of defendant Arnot Ogden Medical Center for summary judgment; said motion granted, summary judgment awarded to said defendant and complaint dismissed against it; and, as so modified, affirmed.


ENTER:

Robert D. Mayberger
Clerk of the Court