Filed 02/13/26

| | | |
|---|---|---|
| VERMONT SUPERIOR COURT |  | CIVIL DIVISION |
| Chittenden Unit | | Case No. 20-CV-00727 |
| 175 Main Street | | |
| Burlington VT 05401 | | |
| 802-863-3467 | | |
| www.vermontjudiciary.org | | |

---

**Max Josinsky, et al v. University of Vermont Medical Center, Inc.**

---

<u>DECISION ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

In this medical malpractice case, Max Josinsky and his parents are suing University of Vermont Medical Center ("UVMMC") for damages based on decisions made and methods used during Max's delivery on April 22, 2011. Jennifer Josinsky's obstetrician was John Gallagher, MD, who had admitting privileges at UVMMC but was not an employee of the hospital. The Josinskys' causes of action include Max's claim for medical negligence (Count 1), Ms. Josinsky's claim for the hospital's failure to obtain her informed consent (Count 2), and Mr. and Ms. Josinskys' claim for loss of consortium (Count 3) due to the loss of care, comfort, and society of Max.

UVMMC has moved for partial summary judgment on the portion of the Josinskys' claims that are based on the alleged negligence by Dr. Gallagher and the resident assisting with the birth, Daena Petersen, and on the loss of consortium claim.[1] The Josinskys oppose the motion, arguing that UVMMC is vicariously liable for any negligence that occurs at the hospital, regardless of whether the negligence is due to conduct of an employee or other individual providing services pursuant to contract.

<u>Undisputed Facts</u>

The parties agree to the following. Ms. Josinsky began obtaining prenatal care at Champlain OB/GYN once she learned she was pregnant. Once she passed her due date, Ms. Josinsky and one of the providers at Champlain OB/GYN decided that Ms. Josinsky would be

---

[1] UVMMC is not seeking summary judgment on the following direct claims against it: "(1) the Hospital's nurse, Kathy Allen, RN, should have intervened when Dr. Gallagher had Dr. Petersen put her hands on the vacuum during the delivery, (2) the Hospital should have had a policy governing the use of obstetrical vacuums which contained the contraindications for their use, (3) the Hospital should have implemented 'an informed consent policy which summarized the discussion with Jennifer Josinsky and listing [sic] all the proposed risks/benefits to both Jennifer and to Max,' and (4) the Hospital failed to ensure that 'complete and relevant documentation in real-time concerning the use of the vacuum' during Max's delivery and his APGAR scores was created." Motion at 3.

induced at UVMMC on April 22, 2011. Prior to being induced, Ms. Josinsky had received no care related to her pregnancy at UVMMC.

Dr. Gallagher was one of the providers at Champlain OB/GYN, and he had admitting privileges at the hospital. A representative of UVMMC testified at a Rule 30(b)(6) deposition that Dr. Gallagher was not employed by UVMMC. (Deft's Exh. F at p. 120.) Dr. Gallagher delivered Max with the assistance of Dr. Daena Petersen, who was a resident in training employed by UVMMC. A vacuum was used to deliver Max, and Dr. Gallagher testified that he "placed the resident's hands under mine [on the vacuum] so that the resident would feel what I was doing." (Deft's Exh. D at p. 143). There is no dispute that Dr. Gallagher operated the vacuum at all times.

Plaintiffs allege that Max suffered injuries resulting from the use of the vacuum. The extent of injuries Max suffered and whether those injuries were due to the use of the vacuum are not at issue for purposes of this motion. The only issue currently before the Court is whether, as a matter of law, the hospital is vicariously liable for any alleged negligence by Dr. Gallagher and/or Dr. Petersen.

Legal Analysis

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). A fact is material "'if it might affect the outcome.'" *In re Estate of Fitzsimmons*, 2013 VT 95, ¶ 13, 195 Vt. 94 (quoting *N. Sec. Ins. Co. v. Rossitto*, 171 Vt. 580, 581, 762 A.2d 861, 863 (2000) (mem.)). "'Where the moving party does not bear the burden of persuasion at trial, it may satisfy its burden of production by showing the court that there is an absence of evidence in the record to support the nonmoving party's case. . . . The burden then shifts to the nonmoving party to persuade the court that there is a triable issue of fact.'" *Boulton v. CLD Consulting Eng'rs*, 175 Vt. 413, 417 (2003) (quoting *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 18 (1995)).

"'The nonmoving party may survive the motion if it responds with specific facts raising a triable issue, and it is able to demonstrate sufficient evidence to support a prima facie case.'" *State v. G.S. Blodgett Co.*, 163 Vt. 175, 180 (1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 324 (1986)). "If the nonmoving party fails to establish an essential element of its case on which it has the burden of proof at trial, the moving party is entitled to summary

judgment as a matter of law." *Washington v. Pierce*, 2005 VT 125, ¶ 17, 179 Vt. 318 (quoting *G.S. Blodgett*, 163 Vt. at 180).

## A.  Vicarious Liability of UVMMC

UVMMC asserts that it is entitled to summary judgment on the Josinskys' claims that are based on Dr. Gallagher's alleged negligence because Dr. Gallagher was not an employee or agent of the hospital in 2011 when Max was born.  As to the claims against Dr. Petersen, who was a hospital employee, UVMMC likewise asserts it is entitled to summary judgment based on the legal concept of a borrowed servant because she was working under Dr. Gallagher's supervision.  Motion at 3–4.  Relying on the Medicare and Medicaid regulations and the theory of institutional negligence, the Josinskys contend that the hospital is liable for any negligence by Dr. Gallagher and Dr. Peterson, regardless of whether Dr. Gallagher was an employee or Dr. Peterson was under his supervision.

Plaintiffs oppose summary judgment by arguing several theories, all based on the undisputed fact that UVMMC is an accredited Medicare/Medicaid hospital and is required to comply with the Joint Commission's Comprehensive Accreditation Manual for Hospitals (CAMH).  The Josinskys rely on 42 C.F.R. 482.12, which states: "There must be an effective governing body that is legally responsible for the conduct of the hospital."  According to the CAMH, "[t]he governing body is ultimately accountable for the safety and quality of care, treatment, and services."  CAMH Standard LD.01.03.01 (Pltfs.' Exh. 2).   The CAMH also states: "The same level of care should be delivered to patients regardless of whether services are provided directly by the hospital or through contractual agreement. Leaders provide oversight to make sure that care, treatment, and services provided directly are safe and effective. Likewise, leaders must also oversee contracted services to make sure that they are provided safely and effectively." *Id.* at LD.04.03.09.  The Medicare/Medicaid regulations require the governing body to be "responsible for services furnished in the hospital whether or not they are furnished under contracts."  42 C.F.R. 482.12(e).

The Josinskys assert that the language of the CAMH and the federal regulations cited above, create medical malpractice and negligence liability for UVMMC for all medical care provided at the hospital, regardless of whether the care is from employees (nurses, doctors, or residents) or doctors with admitting privileges, like Dr. Gallagher.  Opposition at 5.

## 1. Institutional Negligence

In a late-filed submission and at oral argument on November 19, 2025, the Josinskys asked the Court to consider the Illinois case *Steed v. Rezin Orthopedics & Sports Med., S.C.*, 2021 IL 125150, 182 N.E.3d 109, as the basis for UVMMC's liability. The *Steed* case addresses the doctrine of institutional negligence, also known as direct corporate negligence. 2021 IL 125150, ¶ 35. The Josinskys rely on *Steed* and the cases it cites to support their argument that UVMMC should be held liable for negligence by physicians who are not employees, but who have admitting privileges. The Court does not find that *Steed* and the cases it cites supports the Josinskys' position because the allegedly negligent actors in those cases were all employed by the named defendant hospital or medical practice.

The plaintiff in *Steed* filed a wrongful death and survival action against an orthopedics practice, alleging that the decedent suffered a pulmonary embolism due to the practice's failure to monitor the decedent's condition, schedule a timely follow-up appointment, communicate the decedent's concerns to the physician, and direct the decedent to return to the office based on his concerns. 2021 IL 125150, ¶ 6. The Illinois Supreme Court noted that Illinois has recognized an independent duty of hospitals to assume responsibility for the care of their patients since 1965, when the case *Darling v. Charleston Cmty. Mem'l Hosp.*, 211 N.E.2d 253 (Ill. 1965), was decided. *Steed*, 2021 IL 125150, ¶ 35. Unlike the facts here, however, all of the alleged negligent acts at issue in *Steed* were taken by the staff or employee physicians of the defendant medical office. There was no discussion of the office's liability for a non-employee.

At oral argument, the Josinskys referenced *Darling* as further support for their position. *Darling*, however, involved alleged negligence by a hospital based on conduct by doctors and nurses employed by the hospital. *See Darling*, 211 N.E.2d at 257. Again, Dr. Gallagher was not employed by UVMMC, rendering the holding of *Darling* inapposite. Other than *Darling*, the *Steed* opinion cited *Jones v. Chicago HMO Ltd. of Ill.*, 730 N.E.2d 1119 (Ill. 2000), as support for its recognition of institutional negligence. *Steed*, 2021 IL 125150, ¶ 35. The *Jones* opinion acknowledged that "the tort of institutional negligence is a recognition of the comprehensive nature of hospital operations today," but it clarified that "[l]iability is predicated on the hospital's own negligence, not the negligence of the physician." *Jones*, 730 N.E.2d at 1128.

The Vermont federal district court's opinion in *Kaczanowski v. Medical Center Hospital*, 612 F. Supp. 688 (D. Vt. 1985), which the Josinskys cite in their opposition, relies on *Darling*'s

statement in support of institutional negligence. *Id*. at 696. That case, however, involved podiatrists who were denied admitting and podiatric surgical privileges at two different hospitals, *id*. at 690, and the court did not address the hospitals' liability for negligence by non-employee physicians, rendering that case irrelevant to Plaintiffs' argument.

UVMMC's negligence is not at issue in this motion. Only the alleged negligence of Dr. Gallagher and/or Dr. Petersen is at issue. As a result, the Josinskys' reliance on *Steed*, *Darling*, *Jones*, and *Kaczanowski* is misplaced as those cases address only whether hospitals should be responsible for the acts of its employes.

### 2. Employee/Agency Law

To the extent the Josinskys contend that Dr. Gallagher was an agent of UVMMC, or should be considered an apparent agent of the hospital, the Court will address Vermont's law in this area. Typically, when hospitals are found vicariously liable for the negligence of doctors that are not their employees, there is a confluence of three factors: the plaintiff did not choose his or her doctor, the plaintiff relies on the hospital to provide the necessary services, and the hospital fails to put the plaintiff on notice that the physicians are not employees or agents of the hospital. *See, e.g.*, *Cefaratti v. Aranow*, 141 A.3d 752, 766–69, and 767 n.26 (Conn. 2016) (noting that many courts have concluded that apparent authority is established when plaintiff looks to hospital to provide services and hospital, rather than plaintiff, selected individual who provided services and caused injury, citing long list of cases from around country); *McCorry v. Evangelical Hosps. Corp.*, 771 N.E.2d 1067, 1070 (Ill. App. Ct. 2002) (hospital not liable for negligence of non-employee physician with admitting privileges if plaintiff selected physician prior to selecting hospital, but hospital may be liable for doctors physician consulted if hospital held consulted specialists out as agents); *Hicks v. Ronald Fraser Clinic*, 565 N.Y.S.2d 484, 485 (N.Y. App. Div. 1991) ("In the absence of an employment relationship, a hospital cannot be held legally responsible for the actions of a private physician attending his private patient so long as the hospital staff properly carries out the physician's orders."); *Li v. Davidson*, No. MICV201502455, 2015 WL 11111206, at *4 (Mass. Super. Ct. Oct. 19, 2015) (hospitals not vicariously liable for physician's negligence simply because he/she has admitting privileges); *but see Hoad ex rel. Hoad v. Dolkart*, 7 N.Y.S.3d 621, 625 (N.Y. App. Div. 2015) (exception to general rule exists where hospital staff knows physician's orders are contraindicated by normal practice and ordinary prudence requires inquiry into correct procedure).

However, those are not the facts in this case. Ms. Josinsky may not have specifically selected Dr. Gallagher to deliver Max. But, she selected the physicians at Champlain OB/GYN to be her provider with the understanding that the doctor who was on call when she went into labor would deliver Max at the hospital. Deft.'s SUMF ¶¶ 8–11.

Vermont primarily uses the "right to control" test in determining whether an individual is an employee or independent contractor. *Kuligoski v. Rapoza*, 2018 VT 14, ¶ 14, 207 Vt. 43 (citing Restatement (Third) of Agency § 7.07(3)(a) (2006)) (other citations omitted). "'Under th[at] test, a worker is an employee if the party for whom work is being done may prescribe not only what the result shall be, but also may direct the means and methods by which the other shall do the work.'" *Id*. ¶ 15 (quoting *Hathaway v. Tucker*, 2010 VT 114, 189 Vt. 126 (quotation omitted) (other citations omitted)).

However, if that test does not clearly answer the question, Vermont looks at whether "(1) 'one party consents to another party acting as its agent'; (2) the agent 'acquiesce[s] to the arrangement'; and (3) the agent is subject to the principal's control." *Estate of Kuhling v. Glaze*, 2018 VT 75, ¶ 17, 208 Vt. 273 (quoting *Kimco Leasing Co. v. Lake Hortonia Props.*, 161 Vt. 425, 429, 640 A.2d 18, 20 (1993) (quotation omitted)). The party asserting an agency relationship exists carries the burden of proof. *Id*. (citation omitted).

In the unreported trial court opinion *Chouinard v. Northwestern Med. Ctr., Inc.*, the Vermont trial court stated: "Generally, hospitals are not vicariously liable for the negligence of physicians who are not employees or agents of the hospital, but are private physicians who merely have privileges to practice at the hospital." No. S 199-05 FC, slip op. at 3 (Vt. Super. Ct. Feb. 5, 2006) (Bryan, J.) (citing *Vanaman y. Milford Memorial Hospital, Inc.*, 272 A.2d 718, 720 (Del. 1970); *Cooper v. Curry*, 92 N.M. 417, 419 (N.M. App. 1978)). As in this case, the *Chouinard* plaintiff's physician had admitting privileges at the hospital, but she was not employed by or an agent of the hospital. *Chouinard*, slip op. at 3. The court rejected the plaintiff's argument that the hospital was vicariously liable for the doctor's negligence based on the doctrine of apparent agency because there was no evidence that the hospital did anything to lead the plaintiff to believe that the hospital was the physician's employer. *Id*. at 4; *see Kelley v. Rossi*, 481 N.E.2d 1340, 1342–43 (Mass. 1985) ("the very nature of a physician's function tends to suggest that in most instances he will act as an independent contractor."). The same is true

here.  The Josinskys have put forth no evidence suggesting that UVMMC did anything to hold Dr. Gallagher out as their apparent employee or agent.

### 3.  Liability Based on Medicare/Medicaid Regulations

The crux of the Josinskys' argument in their briefing is that the CAMH and Medicare/Medicaid regulations create liability for hospitals in this case for the alleged negligence of non-employee physicians with admitting privileges.  Many courts have addressed this argument. The Court has not found any decisions, however, and the Josinskys were unable to cite any when asked during oral argument, that agreed with their position that the federal Medicare/Medicaid regulations impose tort liability.

In *Blackmon v. Tenet Healthsystem Spalding, Inc.*, for example, the plaintiff argued that the Medicare regulations were a proper basis to find the hospital was vicariously liable for non-employee physicians' alleged negligence.  653 S.E.2d 333, 340 (Ga. Ct. app. 2007), *vacated in part on other grounds*, 669 S.E.2d 237 (2008).  The court disagreed, stating the regulation "does not purport to impose state tort liability on hospitals for the negligence of their independent contractors; rather, it simply outlines that with which the hospitals must comply to receive Medicare." *Id*.

In another case, the Florida Court of Appeal cited opinions from Virginia and Georgia to support its holding that the Medicare and Medicaid regulations specifying the standards a hospital must meet to continue being eligible to treat Medicare and Medicaid patients do not create liability on the hospital due to the negligence of any independent contractor.  *Godwin v. Univ. of S. Fla. Bd. of Trs.*, 203 So.3d 924, 931–32 (Fla. Dist. Ct. App. 2016); *see also Sepulveda v. Stiff*, No. 4:05cv167, 2006 WL 3314530, at *7–8 (E.D. Va. Nov. 14, 2006) (federal regulations regarding participation in Medicare/Medicaid program do not impose non-delegable duty on hospital for negligence by independent contractor; regulations merely determine whether a hospital qualifies for provider agreement under Medicare and Medicaid);  *Gleeson v. Stephani*, No. 02 L 14444, 2005 WL 5872119 (Ill. Cir. Ct. May 17, 2005) ("The section from the Code of Federal Regulations . . . has nothing to do with the issue of agency liability. Rather, it involves issues relating to Medicare and Medicaid."); *Dehart v. Jones*, 310 So.3d 658, 696–97 (La. Ct. App. 2020) ("'[42 C.F.R. §] 482 identifies the conditions of participation for hospitals in the Medicare program. . . .  This section was intended to specify the standards that the federal government will assess when determining whether or not a hospital will continue to be eligible to

treat Medicare patients'" and "'does not create liability for the hospital due to the negligence of any independent contractor.'") (quoting *Godwin*, 203 So.3d at 931–32); *Quarles v. Mt. Clemens Reg'l Med. Ctr.*, No. 2010003845, 2012 WL 10738273, at *3 (Mich. Cir. Ct. July 9, 2012) ("The mere fact that [hospital] accepted the obligations under 42 CFR 482.12 to receive Medicare and Medicaid is insufficient to establish a genuine issue of material fact that it exerted control over Dr. Kurapati and/or Dr. Burnham to create an agency relationship. Accordingly, Plaintiff must establish liability . . . in another manner."); *Texas Health Harris Methodist Hosp. Sw. Fort Worth v. Davis*, No. 02-23-00055-CV, 2024 WL 3611269, at *19 (Tex. App. Aug. 1, 2024) (federal regulations governing Medicare/Medicaid providers "do not purport to preempt state laws regarding agency, to impose tort liability, or to create a nondelegable duty for hospitals to provide competent medical care to their patients").

The Josinskys urged the Court at oral argument and in their briefing to look at the evolving roles of hospitals and find that these cases are no longer applicable. Putting aside that a few of these cases were decided in the last seven years and almost all were decided in the last twenty, the Josinskys fail to articulate what exactly has changed and why that is material. While the Court does not see a policy reason to go against every other court that has decided this issue, even if it did, that would be a policy decision the legislature should consider.

### 4. Law of Undertaking

In their opposition, the Josinskys cite *Derosia v. Liberty Mut. Ins. Co.*, 155 Vt. 178 (1990), as a basis upon which to hold the hospital liable vicariously. Opposition at 6. *Derosia* involved a worker's compensation insurance contract where the insurer was authorized to inspect the premises of its insured and did so. The insured employed the plaintiff/employee who was injured on the job. The case addressed the insurance company's liability to the plaintiff/ employee injured due to the violation of a safety condition that the insurance inspector observed during an inspection of the insured's place of business, but did not require to be corrected. *Derosia*, 155 Vt. at 179–81. The Supreme Court held the insurer could be liable because it undertook to perform safety inspections. The Josinskys argue that *Derosia* supports the proposition under Vermont law that by agreeing to comply with the CAMH standards, UVMMC "undertook to ensure safe and effective care" to all of its patients. Opposition at 6.

*Derosia* relies on the Restatement (Second) of Torts § 324A, which lays out the elements of liability for an undertaking:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) Torts § 324A (1965); *see Derosia*, 155 Vt. at 182.

The Court begins by noting that every negligence claim has four elements: duty, breach, causation, and harm. An undertaking addresses the duty portion of a negligence claim – a defendant voluntarily takes on an additional duty to a third-party through an agreement with someone else. But the Restatement also requires more – a plaintiff must be able to establish liability through one of the three elements described above.

To defeat summary judgment, the Josinskys must present evidence at this phase to establish that UVMMC undertook an additional duty, that it breached a duty that it undertook, and that the negligence was the proximate cause of their injury. *See Sheldon v. Ruggiero*, 2018 VT 125, ¶ 31, 209 Vt. 33 ("[F]or there to be an 'undertaking' at all, the defendant must have undertaken to do the specific task he or she is accused of performing negligently, and the extent of the undertaking defines the scope of the liability.") (citing *Murphy v. Sentry Ins.*, 2014 VT 25, ¶ 34, 196 Vt. 92). They must also be able to point to one of the three additional elements in the Restatement. They have not satisfied these requirements. Nor have they pointed to any court that has applied the concept of undertaking to these types of cases.

Based on the Josinskys' filings the Court understands their argument as follows. To be accredited by Medicare and Medicaid, UVMMC undertook all the obligations imposed by the CAMH and the relevant sections of the Code of Federal Regulations. This undertaking vitiated traditional common law concepts of agency as discussed above in *Chouinard* and below in *Minogue*, and according to the Josinskys, made the hospital responsible for every single act of negligence by any provider with privileges to operate in its hospital. The language of the CAMH and the Code of Federal Regulations is very broad. 42 C.F.R. 482.12(e) (the governing body is "responsible for services furnished in the hospital whether or not they are furnished under

contracts."); CAMH Standard LD.04.03.09 (Pltfs.' Exh. 2) ("the same level of care should be delivered to patients regardless of whether services are provided directly by the hospital or through contractual agreement. Leaders provide oversight to make sure that care, treatment, and services provided directly are safe and effective. Likewise, leaders must also oversee contracted services to make sure that they are provided safely and effectively."). The Josinskys have not presented any argument to explain what specific duties the hospital agreed to under the federal regulations or the CAMH.

But, even assuming the federal regulations or CAMH established an undertaking of a duty by UVMMC, the Josinskys do not identify under which additional element of the Restatement they are pursuing their claim and which facts in the record satisfy the identified additional necessary element. Nor does the Court find them apparent in the record. Section 324A(a) clearly does not apply. There is no evidence that UVVMC agreed to perform a duty otherwise owed by Dr. Gallagher under section 324A(b) or that the Josinskys relied on UVMMC as a result of the undertaking (section 324A(c)).

In the *Derosia* case, the undertaking was specifically to inspect the facility, the employer relied on those inspections, the negligent carrying out of the inspection was the failure to identify the missing safety guard on a saw, and that negligence was the proximate cause of the plaintiff's injury. *Derosia*, 155 Vt. at 182–83. As *Derosia* explained:

> Under § 324A it is not an actor's undertaking alone which subjects him to liability, but rather it is the actor's "failure to exercise reasonable care to protect his undertaking," resulting in either (a) an increased risk of physical harm to the third person, (b) the assumption by the actor of a duty owed by the second person to the third person, or (c) harm to the third person resulting from reliance on the undertaking by the second or third person.

155 Vt. at 183; *cf. Kennery*, 2011 VT 121, ¶¶ 3–6 (Restatement applied to situation where elderly woman's daughter asked troopers to perform welfare check, troopers negligently went to wrong house, and postal worker found woman outside the following day suffering from hypothermia). The Josinskys' have not established that *Derosia* applies to the facts of this case.

UVMMC has met its burden under Rule 56 to show that there is no claim under the undertaking doctrine. The Josinskys have failed to carry their burden of pointing to admissible evidence of a specific duty UVMMC undertook, the additional element of Restatement § 324A that needs to be satisfied, the specific breach of the duty connected to that undertaking, and how

that breach was the proximate cause of the injury. *See Caldwell v. Champlain Coll. Inc.*, 2025 VT 17, ¶ 7 ("'Where the moving party does not bear the burden of persuasion at trial, it may satisfy its burden of production by showing the court that there is an absence of evidence in the record to support the nonmoving party's case[,]'" and "'[t]he nonmoving party may survive the motion if it responds with specific facts raising a triable issue.'" (citations omitted)).

The Court concludes that UVMMC is not liable to the Josinskys based on an undertaking theory of liability and is entitled to summary judgment on this issue.

### 5. Informed Consent

The Josinskys include a count of malpractice based on the hospital's failure to obtain Ms. Josinsky's informed consent (Count 2). UVMMC moves for summary judgment on this count to the extent that it is based on Dr. Gallagher's negligence. The Court is not aware of any authority stating that the hospital, as opposed to a patient's physician, is responsible for obtaining the patient's informed consent. *See* 12 V.S.A. § 1909(a)(1) ("'lack of informed consent' means the failure of *the person providing the professional treatment or diagnosis* to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved . . . .") (emphasis added); *see also Dehart v. Jones*, 310 So.3d at 696 ("the sole duty of obtaining informed consent rests with the physician actually performing the [procedure]"; the Medicare/Medicaid regulations "do not impose tort liability upon [the hospital] as a result of the surgical staff's failure to ensure that [the plaintiff's] informed consent form was properly filled out"); *Newell v. Trident Med. Ctr.*, 597 S.E.2d 776, 780 (S.C. 2004) (obtaining informed consent is matter solely for attending physician and hospital is not liable for physician's failure to obtain informed consent).

The Josinskys do not address this count specifically in their opposition other than in summarizing one of their experts, who stated that Dr. Gallagher failed to obtain Ms. Josinsky's informed consent. Opposition at 8. The Court raised this issue at oral argument, and counsel for the Josinskys acknowledged they did not address it. Although the Josinskys filed memoranda after the oral argument, none of them addressed this issue.

Because this motion is only concerned with UVMMC's vicarious liability for Dr. Gallagher and/or Dr. Petersen, any policies the hospital may or may not have had concerning informed consent are not at issue. Those claims are not addressed by this decision.

Pursuant to the law cited above, the Court concludes that UVMMC is entitled to partial summary judgment on Count 2 to the extent the Josinskys are seeking to hold UVMMC responsible for Dr. Gallagher and/or Dr. Petersen's failure to obtain Ms. Josinsky's informed consent.

### B. Dr. Petersen and the Borrowed Servant Doctrine

UVMMC argues that it is entitled to summary judgment on all claims related to Dr. Petersen's actions because she was, at all relevant times, acting under Dr. Gallagher's express supervision. There is no dispute that Dr. Petersen was a resident in training employed by UVMMC when Max was born. (UVMMC's SUMF ¶ 16 and response). Although the Josinskys contend the hospital was responsible for Dr. Petersen generally, they fail to point to any admissible evidence that Dr. Petersen was not working under the direction of Dr. Gallagher when she was assisting with Ms. Josinsky's delivery of Max. UVMMC contends that Dr. Petersen was under Dr. Gallagher's supervision and should be considered his borrowed servant as a legal matter. Under this doctrine, the hospital is not liable for any negligence by Dr. Petersen; Dr. Gallagher is. Motion at 8–11.

The case *Minogue v. Rutland Hosp., Inc.*, 119 Vt. 336 (1956), involved a similar fact pattern to this case. The plaintiff was a woman who was injured by a nurse during the delivery of her child. *Id*. at 338. The plaintiff's obstetrician was not employed by the hospital, but the nurse assisting the physician was. *Id*. Concluding that the hospital was not liable for the nurse's alleged negligence, the Court adopted the borrowed servant doctrine, writing:

> [T]he doctor was selected by the plaintiff; he was not an employee of the hospital or furnished by it; he had supervision of the nurses in the delivery room and he was the one who directed the nurse to apply pressure. It follows and we hold that at that time such nurse, though a general employee of the defendant, was not its servant in connection with the occurrence here involved.

*Id*. at 341–42; *see also id*. at 341 ("'In the operating room the surgeon must be the master. He cannot tolerate any other voice in the control of his assistants' is equally applicable to the doctor in obstetrical cases in the delivery room.") (quoting *St. Paul-Mercury Indem. Co. v. St. Joseph's Hosp.*, 4 N.W.2d 637, 639 (Minn. 1942)). The Restatement (First) of Agency § 227 (1933), upon which *Minogue* relied, states: "A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others." Comment a explains:

Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other. It is not conclusive that in practice he would be likely to obey the directions of the general employer in case of conflict of orders. The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, <u>or is to be employed in the business of and subject to the direction of the temporary employer as to the details of such act</u>. This is a question of fact in each case.

*Id*., cmt. a. (emphasis added). The Restatement (Second) of Agency § 227 (1958) contains this same language, word for word. *Minogue* is still good law today. *See Weaver v. Brush*, 166 Vt. 98, 102–03 (1996) (relying on borrowed servant doctrine set forth in *Minogue* in negligence case).

The Restatement (Third) of Agency § 7.03 (2006), cmt. d(2), is worded differently than the first iteration cited above, but it reaches the same result:

When an actor negligently injures a third party while performing work for the firm that has contracted for the actor's services, the question is whether that firm (often termed the "special employer") or the initial employer (often termed the "general employer"), or both, should be subject to liability to the third party. <u>Liability should be allocated to the employer in the better position to take measures to prevent the injury suffered by the third party. An employer is in that position if the employer has the right to control an employee's conduct.</u> When both a general and special employer have the right to control an employee's conduct, the practical history of direction may establish that one employer in fact ceded its right of control to the other, whether through its failure to exercise the right or otherwise.

(emphasis added).

In short, since there is no factual dispute that Dr. Petersen was directly supervised by and following directions from Dr. Gallagher while in the delivery room, the law considers her the agent of Dr. Gallagher and not the hospital while in the delivery room with Ms. Josinsky.

## C. Loss of Consortium

UVMMC also moves for summary judgment on Mr. and Ms. Josinsky's claims for loss of consortium, arguing that a claim by a parent for loss of consortium from a child fails unless it

is a wrongful death action. Plaintiffs disagree and argue Defendant's read of the case law is overly narrow and inconsistent with modern trends in loss of consortium law.

Loss of consortium is a derivative claim in which one or more family members may recover damages against a defendant for harm a plaintiff suffered due to harm inflicted on another family member. *Derosia v. Book Press, Inc.*, 148 Vt. 217, 220 (1987). A consortium claim is dependent on the success of the underlying tort action "and arises on account of the [family member's] physical injury." *Id.* (citing *Hay v. Med. Ctr. Hosp.*, 145 Vt. 533, 539 (1985)); *see also Zeno-Ethridge v. Comcast Corp.*, 2024 VT 16, ¶ 38, 219 Vt. 121 (loss of consortium claim is derivative and depends on success of negligence or other claims). UVMMC does not challenge any facts related to the claim of consortium here, but rather challenges whether such a right of recovery exists under Vermont law.

A statutory right of consortium exists for spouses, 12 V.S.A. § 5431, and for parents to recover for "the loss of love and companionship of [a] child and for destruction of the parent-child relationship" in a wrongful death action, 14 V.S.A. § 1492(b). Claims of consortium also existed at common law. *Hay v. Med. Ctr. Hosp. of Vermont*, 145 Vt. 533, 536, 496 A.2d 939, 941 (1985) ("It is clear that recovery of a loss of consortium is an action recognized at common law"). The Vermont Supreme Court has not addressed the question of whether parents are entitled to damages for loss of consortium due to a defendant's negligent conduct towards their child.

The Court has, however, expanded loss of consortium claims beyond the statutory language. The Court considered whether a minor child is entitled to recover for loss of parental consortium when a parent is injured but not killed. *Hay v. Medical Center Hospital of Vermont*, 145 Vt. at 540. The parent in *Hay* was rendered permanently comatose. *Id.* at 535. Recognizing that a child can recover damages for a "pecuniary loss" in the event of a parent's death (14 V.S.A. § 1492(b)), the Court wrote: "[I]t is inappropriate that a minor child may recover such a loss if a parent is killed, but not if the parent is rendered permanently comatose." *Id.* at 537. Then, after stating that "[t]his Court has never denied a child recovery for loss of parental consortium," *id.* at 538, the Court held that minor children are permitted to recover for loss of parental consortium, *id.* at 540.

The Vermont case relied on by Plaintiffs is a 2023 decision declining to dismiss a parent's loss of consortium claim in *Letourneau v. Claffey*, No. 289-12-19 Cacv, 2023 WL

9320693 (Dec. 8, 2023) (Richardson, J.). That case involved the parents' claim on behalf of their child for sexual abuse at a day-care center and the parents' claim for "loss of parental or filial consortium." *Id*. at *1. Judge Richardson analyzed the *Hay* opinion, where the justices "recognize[d] the special bond between parent and child." *Id*. at *3 (citing *Hay*, 145 Vt. at 537–38). "While *Hay* focuses on the child's perspective and the loss of a parent, nothing in its reasoning suggests that the analysis is not equally as strong in the opposite direction." *Id*.

*Letorneau* recognized the evolving attitudes and approaches regarding family relationships. The focus in no longer on "hierarchy and service," and given "these changes in attitudes and approaches, it is not unreasonable to conclude that a significant harm to any parent who loses a child or has an injured child is a non economic [harm] arising from a loss of companionship." *Id*. A loss of consortium claim is not so unforeseeable or "shocking to either parties or to courts. It is a reflection of our current views of family, and it is reasonable to recognize these claims and the true harm felt by parents at the loss or injury of a child." *Id*.

Many other states that have addressed this issue have allowed parents to recover loss of consortium damages due to negligence directed towards their children. *See, e.g.*, *Bishop v. Oakstone Acad.*, 477 F.Supp.2d 876, 889 (S.D. Ohio 2007) (Ohio allows parent to recover damages for loss of filial consortium upon showing that Defendant tortiously caused physical injury to minor child); *Pierce v. Casas Adobes Baptist Church*, 782 P.2d 1162, 1165 (Ariz. 1989) ("[P]arents may maintain a cause of action for loss of their child's consortium when the child suffers a severe, permanent, and disabling injury that substantially interferes with the child's capacity to interact with his parents in a normally gratifying way." (footnote omitted)); *United States v. Dempsey*, 635 So.2d 961, 965 (Fla. 1994) (parents can recover for loss of companionship, society, love, affection, and solace of child injured by defendant); *Ledeaux by Ledeaux v. Motorola Inc.*, 101 N.E.3d 116, 131 (Ill. App. Ct. 2018) ("Parental loss of child consortium is a derivative cause of action based on a recognizable injury to a child."); *Fernandez v. Walgreen Hastings Co.*, 968 P.2d 774, 784 (N.M. 1998) (recognizing loss of consortium claim by parents and grandparents for injury to child upon proof of emotional injury due to loss of child's companionship, society, comfort, aid, and protection); *First Trust Co. of N.D. v. Scheels Hardware & Sports Shop, Inc.*, 429 N.W. 2d 5, 11 (N.D. 1988) ("[W]e hold that a parent can recover for the loss of a child's society and companionship caused by another's negligence."); *Shepardson v. Consol. Med. Equip., Inc.*, 714 A.2d 1181, 1185 (R.I. 1998) (parents entitled to

damages for loss of consortium due to care and maintenance of burns Defendant caused, pain the parents had to inflict on child in caring for burns, and emotional distress this caused parents).

While there are other jurisdictions that have reached a different conclusion, the logic of a common law consortium claim and the general trend are in favor of allowing parents to recover for loss of consortium due to negligence directed towards their children. It is impossible to deny that parents in these situations experience a tangible and measurable harm.

The Court will allow Mr. and Ms. Josinsky's loss of consortium claim to proceed based on the analysis above and denies the motion for summary judgment on this basis. This claim cannot stand alone, however, and will depend on the Josinskys' recovery against the hospital for any negligence by its employees or the hospital itself.

ORDER

For the reasons stated above, the Court GRANTS the motion for partial summary judgment as to Counts 1 and 2 to the extent they are based on Dr. Gallagher's and/or Dr. Petersen's alleged negligence and DENIES the motion as to Count 3.

Electronically signed on February 13, 2026, pursuant to V.R.E.F. 9(d).

Navah C. Spero
Superior Court Judge